GANNON v. LACLEDE GAS LIGHT COMPANY, *Appellant*.

### In Banc, July 6, 1898.*

1. **Pleading**: NECESSARY PROOF: VARIANCE. A party will not be driven out of court simply because his petition alleges more than has been proven, when the unproven allegations are not necessary to authorize a recovery; nor will his action be denied merely because the testimony offered does not support certain averments contained in his petition, when it does support others which are sufficient to authorize a recovery. Nor is this holding in disregard of the rule of pleading and practice that prohibits a variance between the allegations made and proof shown.

2. **Negligence**: ELECTRIC WIRES ALONG PUBLIC STREETS: DUTY OF COMPANY. It is the duty of an electric light company which has strung its overhead wires along public streets of a city, for its own private gain, to see that such streets are at all times maintained in the same condition as to the safety of pedestrians from danger of electricity, as they were before such wires were put there.

3. ———: ———: ———: PRIMA FACIE CASE: SHIFTING OF BURDEN. The plaintiff has made a *prima facie* case when she has shown that one of defendant's wires, charged with sufficient electricity to produce death, was down along a public alley, and that her husband met his death by coming in contact therewith while in the discharge of his duty. The burden is then on the defendant to show that its wires were not down through any fault of its servants or agents, and this burden will not be shifted to plaintiff, although she has alleged that said wires were permitted to become broken in two and to remain down and broken in said alley, when it knew, or by the exercise of care and caution ought to have known, the broken condition thereof.

*NOTE.—Decided on June 7. Motion for rehearing was filed, which was overruled on July 6.

4. **Practice**: SUSTAINING DEMURRER TO THE EVIDENCE. It is not the province of the trial court, after plaintiff has thus made out her *prima facie* case, to sustain an instruction to the jury to find for defendant, offered at the close of all the testimony, on the ground that defendant's proof is undisputed and unimpeached and is sufficient to overcome the *prima facie* case which the conceded and admitted facts make for plaintiff. Nor can this court hold that such an instruction under such circumstances should have been given, after a verdict for plaintiff which has been sustained by the trial court, without assuming the prerogatives which under our Constitution and laws belong to the jury.

5. **Testimony**: WEIGHT: TO BE DETERMINED BY JURY. The plaintiff is entitled to have the jury determine the credibility of the testimony offered, even though he offer nothing to contradict that presented by defendant. Nor can the court assume as a matter of law that the testimony is true, satisfactory or convincing to the jury, simply because no one by words contradicts what has been uttered.

6. ———: ———: PROOF. Before proof can be said to be made of any fact there must be both the testimony of a witness or witnesses, and the acceptance of that testimony as true by the jury. Uncontradicted testimony can not be treated as conceded facts.

7. ———: ———: ———: OFFICE OF COURT. The office of the court in the trial of a case by a jury, is not to say when proof sufficient for a verdict has been made, but is limited to instructing the jury when the testimony tends or does not tend to establish a given fact or facts in issue, and to the corrective action of setting aside the verdict when in the opinion of the court it is not warranted by the testimony.

PER MARSHALL, J., DISSENTING.

1. **Negligence**: ELECTRIC LIGHTS: INSURERS OF SAFETY. It is not the duty of companies having electric wires strung over the public highway, to see that pedestrians on the highway are as safe from injury by electricity as they were before the wires were placed there. Such a holding means that such users of the highway are *quasi-insurers of* the safety of pedestrians. Such companies are only required to exercise a degree of care proportionate to the dangers that reasonable men will apprehend under the circumstances. The failure to exercise such care is negligence. Negligence is the gravamen of an action for damages for death resulting from contact with a broken wire on such highway, but there is no element of insurance or quasi-insurance in it.

2. ———: ABSOLUTE LIABILITY. If an electric light company, operated for private gain, is bound, at its peril, to maintain a public highway as safe and free from injury by electricity as it was before the wires

were erected, its liability is *absolute* for any injury, however much care and diligence the company may have exercised. And if absolute, no proof of care on part of defendant would be availing.

3. ———: SHIFTING THE BURDEN: PRESUMPTION: EVIDENCE. By "shifting the burden to defendant" is not meant that the burden of proof is cast on defendant, but that the burden of the evidence is shifted. In cases where the doctrine of *res ipsa loquitur* is applied a *presumption* of negligence arises, on the theory that the accident would not have occurred had defendant exercised care, and this presumption supplies the want of the proof of negligence by plaintiff, and that presumption becomes the burden that defendant is obliged to overcome. But the burden of *proving* the negligence always remains on the plaintiff.

4. ———: ———: ———: HOW OVERCOME. To overcome this presumption or *prima facie* case, it is sufficient for defendant to show that he used the degree of care commensurate with the dangers which men of prudence would have anticipated under the circumstances. When defendant has done that, if plaintiff introduces no countervailing testimony and does not impeach defendant's witnesses, the defendant is entitled to judgment as a matter of law.

5. ———: PRIMA FACIE CASE: NO PRESUMPTION. A review of plaintiff's evidence in this case shows no presumption of defendant's negligence.

6. ———: RIGHTS OF THE JURY. Juries are not intrusted with *plenary* powers as to their finding of facts. In cases of presumptive negligence, a verdict can not stand, if defendant's unrebutted and unimpeached testimony shows that it was guilty of no negligence whatever. Such defense overcomes the presumption.

PER SHERWOOD, J., DISSENTING.

1. **Prima Facie Case**: CONJUNCTION OF ACCIDENT AND INJURY. The mere conjunction of accident and injury affords no basis for a cause of action. If a defect occurs from which an injury results, no cause of action, *prima facie* or otherwise, arises, unless the party whose duty it was to repair that defect had either actual or imputed notice thereof.

*Appeal from St. Louis County Circuit Court.*—HON. RUDOLPH HIRZEL, Judge.

AFFIRMED.

*Henry Hitchcock* for appellant.

(1) No rule of law is better settled than that the negligence proved must conform to that charged in the petition; and a *fortiori*, that if the plaintiff fails to prove the negligence alleged against the defendant, a demurrer to the evidence should be sustained. *Gurley v. Railroad*, 93 Mo. 445; *Haynes v. Trenton*, 108 Mo. 123; *Buffington v. Railroad*, 64 Mo. 246; *Price v. Railroad*, 72 Mo. 414; *Waldhier v. Railroad*, 71 Mo. 514; *Leslie v. Railroad*, 88 Mo. 54. (2) A verdict which has no substantial evidence to support it ought to be set aside; and if the trial court will not do so, on appeal to this court a judgment on such a verdict will be reversed and in such case this court will reverse the judgment without remanding the cause. *Reichenbach v. Ellerbe*, 115 Mo. 588; *Long v. Moon*, 107 Mo. 334; *Carroll v. Inter-State, etc., Co.*, 107 Mo. 653; *Hunt v. Railroad*, 89 Mo. 607; *Spohn v. Railroad*, 87 Mo. 74; *Powell v. Railroad*, 76 Mo. 83; *Commissioners v. Clark*, 94 U. S. 284; *Hearne v. Keath*, 63 Mo. 84; *Schmeiding v. Ewing*, 57 Mo. 78; *Doering v. Saum*, 56 Mo. 479; *Routsong v. Railroad*, 45 Mo. 236; *Nelson v. Boland*, 37 Mo. 432; *Morris v. Barnes*, 35 Mo. 412. (3) It is insisted for appellant, that there was no substantial evidence, nor any evidence whatever, offered by plaintiff tending to show either: (a) That the wires in question became broken in two or fell to the pavement of said alley in consequence of any negligence on the part of the defendant or its agents, or that defendant was chargeable with any negligence or carelessness in that regard; or (b) that on said day defendant or its agents knew, or ought by the exercise of any care or caution to have known, that said wires were so broken and down, at or before the time when Gannon was killed; or (c) that defend-

ant or its agents, with knowledge or notice, actual or constructive, that said wires were so broken and down in the alley, did negligently permit said wires or any of them to remain so broken and down in said alley for a long time, or for any time after such notice to it; or (d) that the death of said Gannon was caused or in any degree contributed to by such negligence as aforesaid on the part of defendant or its agents in that behalf. (4) In default of such evidence, there was an entire failure of proof by the plaintiff of the cause of action alleged in her petition. (5) The circuit court therefore erred (a) in refusing to instruct the jury, at the close of plaintiff's case, that on the pleadings and evidence, their verdict should be for defendant; and (b) in refusing to instruct the jury, at the close of all the testimony, that upon the pleadings and all the evidence plaintiff could not recover.

*T. J. Rowe* for respondent.

(1) Plaintiff made a *prima facie* case when she proved that her husband met his death on a public highway by coming in contact with a deadly fluid placed on the highway by the defendant. *Buesching v. Gaslight Co.*, 73 Mo. 220; *Clarke v. Famous Shoe Co.*, 16 Mo. App. 464; *Kirkpatrick v. Knapp & Co.*, 28 Mo. 427; *Julia Building Ass'n v. The Bell T. Co.*, 88 Mo. 258. (2) It was gross negligence on the part of the defendant to transmit a dangerous and deadly fluid on wires strung seven feet from a wooden barn that was apt to take fire and melt the wires and cause them to fall into a public highway, and when it was notified of the fire, to neglect to cut off the deadly current. *Light Co. v. Orr*, 59 Ark. 215; *Railroad v. Conery*, 33 S. W. Rep. 426; *Girandi v. Electric Imp. Co.*, 107 Cal. 126; *Ahern v. Oregon T. Co.*, 24 Ore. 276; *Haynes v. Gas*

*Co.*, 114 N. C. 206; *Uggla v. Railroad*, 160 Mass. 353; *Hutchinson v. Boston Gas Light Co.*, 122 Mass. 219. (3) By reason of the fact that defendant was constantly, both by day and by night, carrying a deadly current of electricity on wires strung along a public highway, it was its duty to use the highest degree of care known to human foresight in putting up and maintaining its wires, and it was a question for the jury, and the jury alone, to determine if the defendant had used the care that a prudent and reasonable man, mindful of the dangerous thing he was handling and the public place where he was handling it, and mindful that it was his duty to use the highest degree of care, would have used under like circumstances.

ROBINSON, J.—This action was begun by the respondent Annie Gannon against appellant to recover $5,000 for the death of her husband William Gannon, alleged to have been caused by the fault of the defendant company, as set out in her petition, containing the following substantial averments:

"That the Laclede Gas Light Company, defendant, is a corporation under the laws of Missouri, engaged in the business of furnishing and selling electric light throughout the city of St. Louis, Missouri; that in conducting said business the defendant had erected and strung upon poles along the streets and alleys of said city wires charged with a certain dangerous and life-destroying fluid and current known as electricity. And that on the 18th day of April, 1894, on a certain public highway of said city, to wit, in an alley running east and west through the block bounded on the north by Sheridan avenue, on the south by Thomas street, on the east by Elliot and on the west by Leffingwell avenue; through and along which alley it then and there had erected and maintained as aforesaid its said

wires as aforesaid charged with electricity in the conduct of its said business; and at a point in said alley in the rear of residence No. 2737 Thomas street the defendant negligently and carelessly permitted its said wires, to the number of six or seven, then and there charged as aforesaid, to become broken in two and to fall to the pavement of said alley, and to remain broken in two and down for a long time then and there while full charged with electricity as aforesaid, when it knew, or ought by the exercise of any care and caution to have known, that the said wires were so as aforesaid broken and down and liable if touched by any human being while so broken down and charged as aforesaid to destroy human life. And plaintiff states that while the said wires were then and there in said alley broken in two and down and charged as aforesaid, her said husband, while walking along in the said alley at said point, struck with his foot against one of said defendant's said wires and was thereby instantly killed by the fault and recklessness and carelessness of the said defendant then and there in the premises as aforesaid, to her damage in the sum of $5,000, for which sum plaintiff prays judgment.''

Defendant's answer was a general denial coupled with a plea of contributory negligence on part of plaintiff, to which plaintiff replied denying the allegation of new matter contained in defendant's answer.

At the close of plaintiff's testimony in chief the defendant asked the following instructions: ''The court instructs the jury that on the pleading and evidence the plaintiff can not recover and the verdict will be for defendant,'' which being refused, the defendant offered testimony on its part to the effect that the wires belonging to defendant that killed plaintiff were melted or burned in two by reason of a fire originating in a stable that was fronting on the alley, in which its wires

were strung; that said fire was not caused by the wires and that its origin was unknown; that the defendant was not notified of the existence of the fire or that its wires were broken down in the alley where the fire occurred until after plaintiff's husband had been killed; and that said wires were down upon the ground in the alley only a short while before plaintiff's husband was killed; that there was no appliance at defendant's power house at the time to indicate when one of its wires was grounded; and that defendant had at the time of the fire a contract with the city for lighting certain streets and alleys with electricity, and also certain public and private institutions which required it to keep in operation during the day a constant current of electricity passing over its wires.

At the close of all the testimony in the case, defendant again prayed the court to instruct the jury "that upon the pleading and all the evidence the plaintiff can not recover," which being refused, the jury under proper instructions submitted by the court found a verdict for plaintiff for $3,000 on which in due time judgment was entered, and to reverse which on account of error alleged in refusing defendant's two peremptory instructions this case is here. No objection is made now to the proposition of law announced in the instructions given by the court, if the refusal of defendant's instruction at the close of the case is held good. The sole controversy has grown out of the application of the law to the facts under the peculiar averments of the petition.

The plaintiff to sustain her case offered testimony tending to show that William Gannon in respect to whose death this action was begun, was the husband of plaintiff; that he came to his death by stepping upon an electric wire belonging to the defendant company that was broken in two and lying upon the ground

in one of the public alleys of the city of St. Louis, charged with an electric current of more than double the voltage necessary to kill a human being; that plaintiff's husband was at the time in the discharge of his duty as one of the city firemen, trying to extinguish a fire that had originated in a stable fronting on the alley where he was killed, and along which defendant by permission of the city had strung its electric wires for the purpose of enabling it to furnish light to the city and for various private consumers along the course of the line; that two of a series of seven of defendant's wires strung overhead in said alley were down when plaintiff's husband arrived at the fire, and two other of the firemen engaged with him were also stunned and knocked to the ground at and near the same time and place.

The defendant's contention here is, that no testimony was offered which tended to prove that the death of plaintiff's husband was caused by negligence on part of defendant, after the manner as alleged in her petition; that no substantial evidence, nor any evidence whatever was offered by plaintiff tending to show, either that the wires in question became broken in two or fell to the ground in consequence of any negligence on part of defendant or its agent; or that said defendant knew or ought by the exercise of ordinary care or caution to have known that said wires were so broken and down at or before the time when plaintiff's husband was killed; or that defendant or its agents with knowledge or notice actual or constructive that said wires were broken and down in the alley where plaintiff's husband was killed, did negligently permit said wires to remain so broken and down for a long time after notice thereof. And in the second place it is contended by defendant that, if it be conceded that a *prima facie* case was made by plaintiff in the first instance, it was

entirely overcome by the positive and uncontradicted testimony of defendant's witnesses and for that reason a finding should have been directed for defendant by the court at the close of the case.

While there is no doubt of the general proposition so vigorously and repeatedly asserted by the counsel for appellant in his elaborate and able brief filed herein, "that a party can not declare upon one cause of action upon one negligent act, and recover upon an entirely different act of negligence, without a disregard of all rules of pleading and practice," it must be borne in mind, that it has likewise been a rule of long practice, and frequently asserted in this court, based upon the plainest principle of propriety and fairness, that a party will not be driven out of court merely from the fact that he or she has alleged more than has been proven, when the unproven allegations are shown to be unnecessary averments to authorize a recovery; nor will plaintiff's action be denied merely because the testimony offered does not support certain averments in his or her petition when it does support other averments which are sufficient to authorize a recovery. *Knox Co. v. Goggin*, 105 Mo. 182, and cases cited.

Here the plaintiff in her petition not only alleged the act from which defendant's negligence might be inferred when shown, but went further to say that the act of negligence was committed or suffered under circumstances that admit of no excuse, that is, after notice etc.

Plaintiff's petition was complete when the charges had been made that her husband had met his death upon one of the public alleys of the city, when in the discharge of his duty as fireman, and without fault upon his part, by stepping upon an electric wire of the defendant charged with electricity that defendant had negligently suffered to become broken into and fall to

the, pavement of the alley. The other averments of carelessness on part of defendant, that it knew, or ought by the exercise of care and caution to have known that said wire was broken and down and liable if touched by a human being, while so broken and down and charged with electricity, to destroy human life, were not necessary allegations; and the fact that the act of negligence as alleged to have occurred after the particular manner detailed in the petition, was not shown in all its fullness, is not fatal to a recovery if sufficient was shown to have made a *prima facie* case of negligence under any of the charges made, and this announcement is no disregard of the rule of pleading and practice that prohibits variance between allegations made and proof shown. Surely, no harm could be said to have come to defendant because of plaintiff's failure to establish all that was alleged, if what was proven under the allegations disclosed, showed defendant liable; nor can defendant be said to be surprised at the variance between the proof and the allegations of the petition, if that shortage or variance was in the failure to establish facts that were alleged, which defendant must have affirmatively asserted and shown not to have existed, in order to relieve itself from the *prima facie* case made by the facts proven. It is scarcely necessary to assert that it was the duty of the defendant company to so keep at all times its electric wires over which was continuously being transmitted that most dangerous energy, force, or fluid known to man called electricity, out of the way of the citizen that contact with them would not occur as he went to and fro in the prosecution of his business.

It was a matter of the plainest duty for the defendant to see that the streets and alleys of the city along which by permission it was suffered to place its overhead wires for its own private gain were at all

times maintained in the same condition as to safety from the danger of electricity as they were before its overhead use thereof was begun, and a most imperative duty was placed upon defendant in assuming the overhead use of the public alley with its wires to see that persons passing along and using the alley are not injured thereby, and when proof under the allegations of plaintiff's petition was made showing that one or more of defendant's wires charged with its death dealing force was down upon one of the public alleys of the city, and that plaintiff's husband met his death in the discharge of his duty, a *prima facie* case of negligence was made out against defendant, and the burden was then put upon it to show that its wires were down in the alley through no fault of its agents and servants, notwithstanding the plaintiff had alleged further that said wires were permitted to become broken in two and to remain down and broken in said alley for a long time, when it knew or ought to have known by the exercise of care and caution the broken condition thereof.

The unnecessary or additional allegations made on part of plaintiff can not have the effect of changing the presumption that the law raises from the proof of a given state of facts, and when that presumption attaches from proof made of facts alleged, the after allegation will not stay the course of procedure resulting therefrom.

Plaintiff by her testimony made out a *prima facie* case of negligence against defendant, although her proof was not in full after the manner the negligence was charged in her petition. The proof of facts that were alleged was adequate to cast the burden upon defendant of showing the non-existence of negligence on its part, notwithstanding plaintiff went further in her

petition and charged that the negligent act complained of was done under circumstances that could not be defended against. In the case of *Gurley v. Railroad*, 93 Mo. 445, so often quoted and so much relied on by appellant the proof was of an entirely different act of negligence from that alleged in the petition. It was not mere variance, resulting from incomplete proof of unnecessary averments, as in the case at bar. There the proof was that defendant negligently left certain of its cars on its track without securing them, by reason of which a collision occurred, causing an injury to plaintiff, while the allegation of the petition was that defendant's agents negligently drove a loose car against certain other cars standing on its track, whereby plaintiff was injured. There the negligence shown was no part of the negligence charged, and had no tendency to establish either presumptively or conclusively the existence thereof. In fact the proof on part of plaintiff, in the *Gurley* case, showed the non-existence of the allegations of negligence made in the petition, and the court properly held there was a fatal variance between allegations made and proof shown; or a want of proof to support the allegation of the petition.

If then it is determined that a *prima facie* case of negligence on part of defendant was made out by the testimony offered in behalf of plaintiff in the first instance, and that the plaintiff is not to be defeated on the grounds of variance between the facts alleged and the proof made, we are brought to the consideration of the other questions raised by the presentation and refusal of defendant's second peremptory instruction asked at the conclusion of all the testimony offered in the case. That is, had the court the right to determine upon the conclusiveness of defendant's uncontradicted testimony offered to sustain its burden of proof (made

by plaintiff's *prima facie* case), by an instruction to find for the defendant.

It must be said that in our reports quite a contrariety of opinion has been expressed on this proposition (and that to some extent the bars are left in doubt as to the absolute rule of practice). One line of decisions, prominent among which is the case of *Reichenbach v. Ellerbe*, 115 Mo. 588, so much relied upon by appellant in his brief, holding that when the uncontradicted and unimpeached testimony in the case shows a complete defense to plaintiff's *prima facie* case it was the plain duty of the trial judge to have directed a verdict for defendant, and not have submitted the case to the jury, and that for having refused to so direct at the time, or afterwards when its attention was called to the fact by the motion for a new trial, this court would reverse the case. The converse of that proposition, which was assumed by the trial judge in this, as in the *Reichenbach* case, that when either party to a controversy submits testimony (other than written instruments that call for the courts construction of their meaning and import) to sustain his or her burden of proof, the other party though offering nothing to contradict it is entitled to have the jury pass upon the whole case, and to determine the credibility of the witnesses and the weight to be given to their testimony, has from our earliest reported cases been often asserted with much positiveness. This court as far back as the 4th Missouri Report, at page 106, in the case of *Bryan v. Wear*, when the plaintiff had offered uncontradicted evidence of his title in an action of ejectment, announced as a rule, that it was error to instruct the jury as to the weight of evidence by telling them that plaintiff had shown a good title, because it was practically telling the jury that they must believe the evidence. Also in the early case of *McAfee v. Ryan*, 11 Mo. 364, this

court refused to disturb a verdict rendered against the undisputed testimony of a witness when nothing appeared in the record to impeach his veracity or to indicate why it should not have been believed.  If this court can now set aside the finding of the jury on the matters of facts involved in the issue raised by defendant's answer, we must assume to ourselves the prerogative which the writer has always thought under our Constitution and laws rested exclusively with the jury. If we can set aside this finding on the grounds that the defendant's proof was undisputed, and sufficient as a defense, we ought to reverse the case, and in that we have made the finding of facts and passed our judgment thereon contrary to the finding of the jury with the apparent sanction of the trial court as indicated by its refusal to set aside the finding so made by them.

Upon the broad, simple proposition that the juries are the triers of facts in all cases of this character, certainly no question can be made.

Here by the well established facts a *prima facie* case was made out by plaintiff, and the *onus* was cast upon the defendant of relieving itself from responsibility by showing that plaintiff's husband met his death as the result of an accident, not occasioned by that want of care and caution which the law made obligatory upon defendant to bestow, in using its highly dangerous agency, electricity, through overhanging wires upon the public streets and alleys of the city.

That issue of fact was addressed to the consideration of the jury for their determination, and the trial court in the first instance had no right to say to them, by an instruction, when they should become satisfied with the facts of the defense, and to have done so, would have substituted the judgment of that court for that of the jury.  The plaintiff was entitled to have the

jury determine the credibility of the testimony offered, even though she offered nothing to contradict that offered in behalf of defendant, and it is not to be assumed by the court as a matter of law that evidence is true, satisfactory or convincing to the body called upon to hear it, from the mere fact that no one by words contradicts what has been uttered. The right to judge the weight of evidence and the credibility of witnesses, implies of necessity the right to resist the influence of any part of what the witnesses may have testified to; of saying that it wants in the power to convince. If the mere presentation of evidence of a fact is to be called its proof, because undisputed by any other witness or witnesses, then the right to judge the weight of evidence and the credibility of witnesses in such cases means nothing. There must not only be the presentation of the evidence of a fact by a witness or witnesses, but its acceptance by the jury before proof can be said to have been made complete upon any given point, and if what has been uttered or said by a witness or witnesses fails to convince the mind or intelligence addressed, has not been accepted by them, then no sufficient proof has been made, however positive or unqualified the utterance of the witnesses upon which a finding can be predicated. The office of the court in the trial of a case by the jury is not to say when proof has been made sufficient for a verdict, but is limited to instructing when testimony offered tends or does not tend to establish a given fact or facts in issue. Testimony may tend in many instances to prove a given issue that falls far short of convincing proof. Suppose that a suit has been brought upon an open account for goods forwarded by plaintiff to defendant at his request, upon which issue has been joined by answer. A jury is called to try the cause, and the most positive testimony is offered as to the existence of every

averment of plaintiff's petition, and defendant offers no proof whatever, surely no one would say that the court had the right to direct a finding for plaintiff upon the uncontradicted testimony, and why? Because defendant asked to have the facts of the case determined by a jury, and not by the court, as would be done if the court could direct a given finding. Because "the right of trial, as heretofore enjoyed, shall remain inviolate," etc. Section 28 of article II, Constitution of Missouri. See Rev. Stat. 1889, sec. 2131.

Again suppose that suit has been instituted on a note of hand, and issue joined by a plea of payment on part of defendant, a jury is called to try the case, the burden is then upon defendant and he swears positively that at a given time and place he paid plaintiff the amount of the note in full, principal and interest. No witness is called to contradict his statement. The payee in the note may have been absent from the State and unable to be present at the trial, or we may suppose that the suit had been brought by an administrator and some witness had been called to the stand who swears positively that he either saw the defendant pay the deceased payee of the note, the full sum due thereon, or that the deceased had told him that the note had been paid in full. The administrator can not dispute the statement thus sworn to, by any known witness, neither is he able to impeach the character of the witness who thus testified, by any other witness, on the ground that his past reputation for truth and veracity was bad, or to effect by the most rigid cross-examination a self impeachment. Would the trial court under either of the circumstances above named be compelled to instruct the jury to find for defendant on the uncontradicted and unimpeached testimony? We think not. The jury in the exercise of its prerogative of judging the weight of evidence and the credibility

of witnesses might say, "It fails to convince us;" "it fails to satisfy our minds;" "we do not believe it." Something in the action, in the manner, in the bearing of the witness upon the stand (which finds no place in the transcript that reaches this court) might have repelled belief in the minds of the triers of the facts; and without belief in the existence of the truthfulness of a given statement or statements made, no verdict predicated thereon can be reached, and when not reached or believed, a verdict can not be ordered by a mandatory instruction from the court. If the jury in this as in all cases have the right to judge of the credibility of witnesses and the weight of their testimony, how could the trial court have dictated its verdict, contrary to that afterward made, without an abridgement of the exercise of that right, without substituting its beliefs and finding for that of the jury. The occurrence of undisputed testimony during the progress of the trial should furnish no occasion for a change in the rule of practice of asking the opinion of the jury on questions of fact, unless we are willing to announce for the future guidance of the bench and bar that uncontradicted and undisputed testimony is to be held and treated as facts agreed (and if this is done, to make proof and pleading consistent in this case plaintiff should have been required to withdraw her replication denying the allegation of new matter set up in defendant's answer, and thus new complications would arise).

To be logical and consistent under our Constitution and laws, we think the only course that can properly be pursued and maintained is, that all questions of facts, in suits at law, must finally and conclusively be determined by the jury subject only to the corrective action of the trial court, to set aside the finding of facts, which in the opinion of that court is not war-

ranted by the testimony, but never to coerce an opinion by a mandatory instruction directing a finding of fact in favor of one or the other of the parties litigant, according to its judgment of the facts. To the question of facts the jury alone, and not the court, must respond. The judgment of the trial court, will be affirmed. GANTT, C. J., BURGESS and WILLIAMS, JJ., concur. SHERWOOD, BRACE and MARSHALL, JJ., dissent.

MARSHALL, J. (*dissenting*).—The importance of the legal principles involved in this case and the fact that in some respects it is the first case of its kind that has reached this court, demands that I shall give my reasons for my dissent from the opinion of the majority of the court.

To understand the points involved and to appreciate the force of my dissent it is necessary to state the case more fully than is done in the opinion of the majority.

The suit is an action for damages for the death of plaintiff's husband. The petition avers that the defendant is a duly incorporated Missouri corporation, organized for the purpose and engaged in the business of furnishing electric light in the City of St. Louis; that it had wires, strung on poles, set up on the public streets, conveying and charged with, "a certain dangerous and life-destroying fluid and current known as electricity;" that on April 18, 1894, it had such wires, so strung and charged, in a public alley in the rear of house No. 2737 Thomas street, and that "the defendant negligently and carelessly permitted its said wires, to the number of six or seven, then and there charged as aforesaid, to become broken in two and to fall to the pavement of said alley and to remain broken in two and down for a long time then and there while

full charged with electricity as aforesaid, when it knew or ought by the exercise of any care and caution to have known, that the said wires were so as aforesaid broken and down and charged as aforesaid to destroy human life;" that while the wires were so down plaintiff's husband, while walking along the alley, struck his foot against the wires, and was instantly killed. The answer is a general denial and a plea of contributory negligence on the part of plaintiff's husband.' The reply denied contributory negligence.

The *evidence* for *plaintiff* was, substantially as follows.

*Annie Gannon* testified that she is the widow of William Gannon, who was killed on April 18th, 1894; that he was thirty-eight years old, employed in the fire department, and was a strong, healthy man. *Ernst Hilgendorf* testified that he is the city telegraph operator; that it was his duty to receive alarms of fire and distribute them to the engine houses and other city departments; that on April 18th, 1894, at 10:56 a. m., he received an alarm from Box No. 129 in the neighborhood of Leffingwell avenue and Thomas street; that the Laclede Gas Light Company have connection with his office, but he could not say whether they were given the alarm on that occasion. *Peter J. Dolan*, testified that he was standing on Glasgow avenue, between Sheridan and Cass (three blocks from the fire), when he heard the alarm; that he ran to the fire, saw smoke coming from the shed, went into the alley about ten feet, to a point thirty or forty feet from the burning shed and saw two wires down and there may have been more; that the fire department got there two or three minutes later, and within two minutes after that he was put out of the alley by a policeman; saw a man (not identified as the deceased) lying in the alley when the policeman was putting him out of the alley; that

at that time the flames had not burst out of the top of the shed.

*Frank J. Hildebrand* testified that he was at work in his barber shop, 2601 Sheridan avenue, cutting witness Sullivan's hair; that when the fire alarm sounded he and Sullivan ran to the fire, which was a block and a half west of his barber shop; that the smoke was dense and it was "pretty hot;" that he went into the alley and saw an electric wire lying north and south across the alley; that from two to four minutes later the fire department arrived; that Gannon came into the alley from the south and was killed very soon after he got there; that he, witness, assisted in pulling the hose into the alley, and got a pair of nippers and gloves to cut the wire; that he was excited on account of seeing Gannon lying on the wires and he got the nippers after the man was hurt.

*John Sullivan*, a police officer, whose hair Hildebrand was cutting, testified that he heard the alarm at half past eleven o'clock in the morning or between 11 and 12; that he ran to the fire; noticed a lot of smoke, and the adjoining shed across from it was smoking too; that he went into the alley, but as it was getting "pretty hot" he went into the yard; that "three or four minutes after that the fire department came, and when the fire was over, pretty near over, I saw Mr. Gannon, a fireman, coming out from the hallway, and I noticed a black wire about two feet from where he stepped out, and I noticed him having a nozzle in his hand; as he came out I saw him step on this wire; I think it was the right foot, and I noticed him give a groan and halloo 'Oh,' that is all I noticed." Witness further testified that the wire was down when the fire department arrived, and that when he saw the wire the flames had burst out on top of the shed.

*James Cain* testified, that on April 18th, 1894, he was pipeman in No. 17 Company, which was stationed on Easton avenue between Leonard and Compton (five blocks west of the fire); that his company was among the first to reach the fire; that they started down the alley when somebody hallooed that the wires were down, and to look out for the horses, just in time for them to stop; that the alarm came in about 11 a. m.; that Gannon belonged to Chemical No. 4 company, and got there after he, witness, did; that Gannon came into the alley from Thomas street, through the yard, out of a hallway or door in the alley, with a pipe in his hand; that he saw him fall; was 10 or 12 feet from him; that a man threw a rope around him and pulled him away from the wire as soon as possible; that the fire was nearly under control when Gannon was killed, which was twenty minutes after witness reached the fire, and he reached the fire two or three minutes after the alarm came in; that the wire which killed Gannon was a large wire, and hung down along the pole; that Hester (Assistant Chief) tried to cut it with an ax, striking it against the pole; that Gannon's engine was stationed on Washington Ave. and 20th street, about ten blocks south and five blocks east of the fire; that the defendant's power house or plant was located at the foot of Mound street, which was about twice as far from the fire as Gannon's engine house was from it; that everybody knows that when wires are down they are dangerous; that firemen carry wire cutters; that he could see from the west end of the alley that the wires were down; that his company played on the fire quite a while before Gannon's company arrived; that No. 5 company came in from Sheridan avenue on the north side of the alley and that Dolan and then Shivley were knocked down by the wires and a few minutes afterwards Gannon fell; that he did not

see anyone attempting to cut the wires before Gannon or Dolan fell.

*Luke McConn* testified, that he is a member of Hook & Ladder Company No. 8, which was stationed at the same engine house with Gannon's Company; that they went to the fire together; that he, Gannon and Cronin worked on the Thomas street side of the shed ten or twelve minutes before going into the alley; then some one called to bring the chemical line into the alley and witness and Gannon pulled the pipe into the yard on the Thomas street side; that he and Gannon stepped into the alley, when he got a shock, jumped to another part of the alley and shouted "Look out, Billy;" that Gannon was right behind him and as he looked around Gannon stepped out into the alley, reeled and fell over; that there was from four to six inches of water in the alley, from the hose and the rain, it being just after a thunderstorm; that the wires came down in a looped shape and looked pretty big to him when he stepped into the alley; that all those wires were insulated, "if they don't get burned or torn off;" that he did not know how the insulation got off of these wires.

*Robert E. Cronin* testified, that he belonged to the same chemical company with Billy Gannon; that he was at the fire; that they took the hose through the yard to the shed; that he did not see the accident to Gannon; that it was a pretty fierce fire for a shed fire; that it was a two-story shed with a hallway through it; that all firemen know that electric wires are dangerous if they are down or disarranged.

*Charles Swingley* testified, that he is Chief of the Fire Department; knew Gannon, as a fireman, about four years; that he was at the fire; that on arriving there found a fire raging—it was a pretty fierce blaze when they commenced playing on it. *Ques.* (By the Court) "When did you first notice those wires that

were down there? *Ans.* On entering the alley. *Ques.* And then you say, the fire was raging? *Ans.* Yes, sir. *Ques.* It had been for some time? *Ans.* It appeared to me so. *Ques.* (By counsel for defendant) It was raging pretty fierce with the flames away up in the air? *Ans.* Yes, sir."

*Andrew J. O'Reilly* testified that he has been a professional electrician for twelve or fifteen years, and is Supervisor of City Lighting in St. Louis; that he is acquainted with the electric light wires in the city; that he arrived at the fire about twenty minutes after it started, when it had burned out; that he found seven wires down, one telephone wire belonging to the city fire department, and six copper wires belonging to defendant; that the wires were strung on poles, east and west in a public alley. Witness produced six wires which were cut on the day of the fire from the wires in the alley; and testified that the five copper wires were used by the defendant to furnish electricity for light and power purposes under contract with the city and for private lights and power north of Washington avenue; that the large wire produced by him was part of the Brush incandescent light system, being the main wire supplied with electricity from defendant's power house on the Levee and Mound street, and carried a charge of 2200 to 2300 volts; that the power circuit carried about 500 volts, which would shake one up seriously and burn him; that 1100 volts will kill a man; that there was no current at that time on the small wires of the alley lighting circuit, except at night; that when he arrived at the fire he found the big wire burnt in two; that if a wire breaks the defendant has no automatic method of knowing where the break is; that the only way it finds out that the wire is broken is that the lights beyond the break go out and the customer reports the fact to defendant, who then sends out a

man to repair it; that defendant uses the multiple system; that there is less danger in using the multiple system than the series system, because the latter requires more voltage; that the voltage used in these wires was no more than was required by defendant's contract with the city; that all the electric companies in St. Louis have a system of receiving fire-alarms; that the defendant, under contract with the city, furnishes electric light to the various engine houses and other public institutions along the line, and is required, by that contract, to keep the circuit of electricity in operation all the time, day as well as night; that the pieces of wire exhibited by him were cut off for him by an inspector of the lighting department while he was at the fire, and *that in his opinion these wires were broken by reason of heat underneath;* that when he saw the wires the day of the fire quite a length of the insulation was burned off; that before the fire the wires were strung in accordance with the city ordinances, without any unusual sagging between the poles, and were 25 feet above the ground; that he knew Gannon and had talked with him about his work; that all firemen know the dangers of electric wires, and he thought Gannon had spoken to him about it; that Gannon was a lineman before he was a fireman; that the defendant's contract with the city required it to keep the lights burning on this circuit all the time, to furnish light to the engine houses Nos. 28 and 29 and the mounted police station; that in his opinion those wires could not have set fire to the shed; that the large wire belonged to defendant's incandescent Brush system, which was a metallic circuit, having no ground connection, and was supplied with electricity generated at defendant's station at the foot of Mound street; that defendant has appliances which show when both wires of the circuit are down, but that in this case only one of the wires was down and that

defendant had no way of knowing the fact in such cases; that defendant's contract required it to keep a constant current of 2000 volts for that part of the city, which was a proper current for that purpose; that the large wire was strung almost over the shed and that the burning of the shed would have produced heat enough to affect the wire; that in his opinion the breaking of these wires was caused by "the wires becoming overheated at this particular point, lost their strength and there was a reduction of cross section due to the tension in the wires and a consequent break;" that in his opinion the break in the wires was caused by the fire; that he examined the wires at the time of the fire and there was no sagging; that if the wires between these poles had sagged enough to cause the wires to touch the shed, the wires on the other spans would have sagged too, but they were all taut and there was nothing to indicate that the wire had sagged and set fire to the shed; that engine house No. 28 is west of where the fire occurred, and that a telephone message was received that day at about ten minutes past 11 o'clock, from engine house No. 28 that its lights went out at 11 o'clock, which was a short time after the fire alarm was given, which occurred at about five minutes before 11 o'clock; that it was impossible for these lights to have continued burning after the break in those wires; that at fifteen or twenty minutes past eleven the defendant was notified from witness' office that the lights were out at No. 28 engine house; that the fireman had gone to the fire before the notice was given to defendant.

This was all of plaintiff's evidence. Thereupon defendant demurred to the evidence, the court overruled the demurrer and defendant duly excepted.

The *defendant* then introduced *evidence* as follows:

*S. A. Keightley* testified, that he was present at the fire, was filling an ice box, right north and a little north-

west of the fire when his attention was first attracted to the fire; that he ran to the fire and at the request of a lady he ran to the alarm box on the northeast corner of Leffingwell avenue and Dickson street, a block and a half from the fire, and turned on an alarm, then came back to the fire; that the firemen arrived in three or four minutes; that before he turned on the alarm there was considerable fire—"the whole back part of the stable was blazing;" that he noticed the electric wires on the poles before he turned on the alarm; that none of the wires were down or he would have noticed it; that on coming back, after turning on the alarm, he noticed three or four wires down.

*J. W. Beyer* testified, that his attention was called to the fire when Keightley was fixing the ice box; that he ran to the alley, walked into it ten or fifteen feet and watched the fire; that when he arrived the whole back of the shed was a blaze; that the wires were then up on the poles; that about a minute after he went into the alley and before the fireman came, he saw the wires fall, and because of the wires being down and because of the heat he got out of the alley; that he saw Gannon when he reached the fire, when he went into the alley and when he fell.

*E. M. Wordsworth* testified, that he lived at 2733 Thomas street (the second house from the fire); that he heard the commotion and went to the alley and saw the fire; that the wires were all up when he arrived at the fire; *that he saw the wires burn in two and fall*, and thinks some of the firemen were there when they fell.

*August Keil* testified, that he lived on Leffingwell avenue on the corner of the alley that runs midway between Thomas street and Sheridan avenue (which is the alley in question, and would make his house about 75 feet from the fire); that he was in the second story of his house when he noticed the smoke coming out of

the shed; that he ran into the stable and saw it was on fire down stairs—there was some wash strung up in the stable, which he took down, and laid it on the steps, and by this time a man got a garden hose and began squirting it on the stable but it got so hot that he could not go back through the alley; that when he went through the alley the wires were all up on the poles, and when he got out of the stable the blaze was shooting up, and *he saw the wires curl up and drop down into the alley;* that this was two or three minutes before the fireman arrived.

*Miss Josie Keil* testified, that she is a sister of August Keil and lived with him; that she smelt the smoke and her brother called "fire," and ran out of the house; that she looked out of the window—could only see smoke at first, then some one burst open the door and the flames shot out; that the electric wires were all up on the poles; *that when the flames shot up the covering of the wires caught fire, the wire burned in two and fell.*

*John Fitzgerald* testified, that he reached the fire before the firemen came; that he stood at the entrance of the alley on Leffingwell avenue, saw the smoke burst out around the windows and doors; that the electric wires were all up; that he helped a lady to get her surrey out of a stable on the opposite side of the alley from the fire and pulled it out through the alley; that the wires were up then; that he saw the wires fall and he got out of the alley as soon as he could.

*Thomas J. Foster* testified, that he went to the fire with Fitzgerald; that he saw the wires burn in two a few minutes after he arrived at the fire; that he warned the driver of No. 17 reel that the wires were down and he just had time to stop; that the rubber around the wires caught fire and burned, and the wires fell close to

him, and he hallooed to Mr. Sweeney that the wires were coming down and Sweeney got his pants burned in getting out of the alley.

*Wm. Gallagher* testified, that he is the general foreman of the electric light department of the defendant company, and remembered the fire; that the alarm was given about 11 o'clock; that defendant's lines and circuits in that vicinity were at that time in first class condition; that defendant has an instrument known as a circuit breaker, when both of the wires are down, but that it would not indicate the falling of only one wire if the other was up, and that he knows of no device which would do so; that the first notice defendant had that the wires were down was about seven minutes past 12 o'clock, which was received by telephone from the city lighting department; and up to that time there had been no indication of any disturbance on that circuit; that he immediately went out to repair it; that if one wire of a circuit is down it is not necessarily dangerous, but if both are down and you touch one of them it is very dangerous; that if both wires are down and resting in a pool of water, the circuit would be continuous and the circuit breaker would give no indication of the break; that there was no indication at company's works that morning that there was any grounding of the circuit; that defendant furnishes light for the city institutions and is required by contract to keep the lights burning all day; that defendant got the fire alarms at the same time the fire department did, and that on this occasion the alarm came from the box at Leffingwell avenue and Dickson street, and that defendant had no live wires in that neighborhood, and knew nothing about any disturbance until the report came that the lights were out in No. 28 engine house.

*Robert Quain* testified, that he is general foreman of the city fire and police department; that he was familiar with the wire in question and that it was in good condition when put up and was a well constructed line, erected in compliance with the city ordinances.

*M. B. Fittsworth* testified, that he is a city inspector of fire and police telegraph; that he was at the fire at 11:30 and cut the wires off the poles; found the line in good condition except some of the wires were down.

This was all the evidence in the case. The plaintiff introduced no evidence in rebuttal.

Thereupon defendant asked and the court refused to give the following instruction, the defendant duly saving its exception: "The court instructs the jury that upon the pleadings and all the evidence the plaintiff can not recover."

The court then instructed the jury in various respects, but as no point is urged here as to the correctness of the rulings in this respect, it is unnecessary to refer to that feature of the case.

There was a verdict for plaintiff for $3,000, and after unsuccessful motions for new trial and arrest, the defendant appealed to this court.

## I.

The opinion of the majority of this court, after laying down the undisputed proposition that a petition which alleges facts sufficient to authorize a recovery is good, notwithstanding it contains other allegations not necessary to make out the plaintiff's case, holds that "plaintiffs' petition was complete when the charges had been made that her husband had met his death upon one of the public alleys of the city, when in the discharge of his duty as fireman, and without fault upon his part, by stepping upon an electric wire of the defendant charged with electricity that defendant had

*negligently* suffered to become broken in two and fall to the pavement of the alley." And after thus adjudging the petition sufficient and disregarding the other allegations of the petition as unnecessary, the opinion proceeds: "It is scarcely necessary to assert that it was the duty of the defendant company to so keep at all times its electric wires over which was continuously being transmitted that most dangerous energy, force or fluid known to man called electricity, out of the way of the citizen that contact with them would not occur as he went to and fro in the prosecution of his business. It was a matter of the plainest duty for the defendant to see that the streets and alleys of the city along which by permission it was suffered to place its overhead wires for its own private gain, were at all times maintained in the same condition as to safety from electricity as they were before its overhead use thereof was begun, and a most imperative duty was placed upon defendant in assuming the overhead use of the public alley with its wires to see that persons passing along and using the alley are not injured thereby, and when proof under the allegations of plaintiff's petition was made that one or more of defendant's wires charged with its death-dealing force was down upon one of the public alleys of the city and that plaintiff's husband met his death in the discharge of his duty, a prima facie case of negligence was made out against defendant, and the burden was then put upon it to show that its wires were down in the alley through no fault of its agents and servants, notwithstanding the plaintiff had alleged further that said wires were permitted to become broken in two and to remain down and broken in said alley for a long time, when it knew or ought to have known by the exercise of care and caution the broken condition thereof. * * * Plaintiff by her testimony made out a prima facie case of

negligence against defendant, although her proof was not in full after the manner the negligence was charged in the petition. The proof of the facts that were alleged was adequate to cast the burden upon the defendant of showing the non-existence of negligence on its part notwithstanding plaintiff went further in her petition and charged that the negligent acts complained of were done under circumstances that could not be defended against."

And having reached this conclusion the opinion holds that when the burden is thus shifted to defendant to exonerate itself, and it does so by positive evidence that it was wholly without fault or negligence, and when the plaintiff introduces no evidence whatever countervailing defendant's complete exoneration, the court must submit the case to the jury and can not direct a verdict for defendant, because the jury are the triers of all questions of fact, and have the right in any case to say the uncontradicted testimony does not satisfy or convince us and to find a verdict in the teeth of the evidence, and that unless the trial court sees fit to set the verdict aside this court is powerless to interfere.

These conclusions are so much at variance with my understanding of the law and of the prior decisions of this court, that I feel compelled to dissent and to express my reasons.

Analyzed and reduced to syllogisms the majority opinion asserts two propositions: *First*: A live electric wire down on a public highway; the plaintiff injured by contact with it; conclusion, a prima facie case of negligence made out against defendant; and, *Second:* A prima facie case made by plaintiff as stated; the burden shifted to defendant to exonerate himself, which he does by competent testimony which is not assailed or contradicted by plaintiff, nor the witnesses attempted to be impeached; conclusion, a *question* of fact

is presented which the jury alone has the right to determine.

I can not agree to either proposition, and especially so under the facts in this case.

The reasoning of the court may be expressed in a nutshell. It is that it is the duty of a person having such wires strung over a public highway to see that the pedestrians on the highway are as safe from the danger of electricity as they were before the wires were placed there. This can only mean that such users of the highway are, at least, quasi-insurers of the traveling public. No American case that the industry of learned counsel has cited, holds such a doctrine. The opinion cites none. After patient research I have found none. THOMPSON on Law of Electricity, section 65, refers to the decision of Mr. Justice BLACKBURN, in the Court of Exchequer Chamber, in the case of *Fletcher v. Rylands*, L. R. 1 Exch. 265, where the obligation of a land owner who collects water on his own land and it escapes and injures others, was decided, and says, "It may be doubted whether persons or corporations employing for their own private advantage so dangerous an agency as electricity, ought not to be regarded as quasi-insurers, as to third persons, against any injurious consequences which may flow from it." The distinguished author cites no authority to support the intimation of his opinion contained in the text quoted, but contents himself with a reference to *Fletcher v. Rylands*, *supra*, which even a casual consideration will show is not applicable. Water collected on one's land for his own purpose, is not like electricity conveyed along a public highway for the public purpose of lighting the streets and furnishing light and power to citizens in their business houses or residences abutting the streets. However, the author says, section 66, that the doctrine of *Fletcher v. Rylands* has not met with ap-

proval in all American jurisdictions, and cites, inter alia, the case of *Morgan v. Cox*, 22 Mo. 373, in which LEONARD, J., speaking for this court, held: that negligence in the performance of a lawful act confers a right of action upon one injured thereby, and that reasonable care means such care as is proportionate to the probability of injury that may arise to others. The cases cited by plaintiff's counsel do not maintain the doctrine that the defendant is an insurer. A fair type of those cases is *City Electric St. Ry. Co. v. Conery*, 33 S. W. Rep. *l. c.* 428, in which the rule is stated to be, "In cases where the wires carry a strong and dangerous current of electricity, and the result of negligence might be exposure to death or more serious accidents, the highest degree of care is required. This is especially true of electric railway wires suspended over the streets of populous cities or towns. Here the danger is great, and the care exercised must be commensurate with it. *But this duty does not make them insurers against accidents*, for they are not responsible for accidents which a reasonable man, in the exercise of the greatest prudence, would not, under the circumstances, guard against."

The degree of care required in law is proportionate to the dangers that reasonable men would apprehend under the circumstances. The failure to exercise such degree of care is negligence. But negligence is the gravamen of the action, and there is no element of insurance or quasi-insurance in it. There may be a difference in the degree of care required of an electric company and of a steam or street railway company using or crossing a public highway. All increase the dangers to the pedestrians. But none are required to see to it at their peril that the danger to the pedestrian is no greater after they use the highway than it was before. The danger to the pedestrian on a highway increases

in proportion to the increased travel and methods of travel on the highway, and in proportion to the ever increasing burdens cast upon the highway in large cities by the exercise of new and necessary uses, which are lawful because they subserve a public purpose.

The case of *Haynes v. Gas Co.*, 114 N. C. 203, more nearly resembles the doctrine announced in the majority opinion in this case than any case that has been cited or that I have found. It announces the doctrine that proof of a "live" wire down in the highway and injury to a pedestrian makes a "complete prima facie case of negligence," and the burden is cast upon the defendant to show that the "live" wire was in the street through no fault of its servants or agents. That court undertook to support the doctrine by reference to other cases and authorities, but an examination thereof easily shows that they go only to the extent of holding that care commensurate with the dangers to be apprehended must be used.

In our progressive day electricity is a recognized necessity, as much so to light the streets and alleys, the business houses and the private residences, as to furnish the motive power for rapid transportation. It can only be conveyed by means of wires strung above or below the highways. It is lawful to so string them under the laws of this State, if proper consent of the public authorities is obtained, for such uses of the highway subserve a public purpose. Being lawfully on the street, the duty is cast upon those who erect and maintain them to use such care and skill in the erection and maintenance of them as is commensurate with the dangers that reasonable and prudent men would apprehend or expect to flow to the public from their presence, and no further. But it is not the law that it is their duty to see to it, at their peril, that the highway is kept as safe and as free from danger after they were erected as it

was before. Their very presence and nature increases the dangers on the highway. If the doctrine announced by the majority opinion is the law, then one of two conclusions must follow, either it is not lawful to put them there, or else those who do so do it at their peril and become insurers. I respectfully disagree with such conclusions. The cases in other jurisdictions upon liability in such cases do not proceed upon the idea that the defendant is under such a duty to the public. They are predicated upon the theory that the defendant is liable only for negligence, and turn upon a question of practice as to the proper manner of presenting the case. They hold that when the plaintiff proves that such a wire is down, and that he was injured thereby, he has made out a good prima facie case of negligence, because such things would not usually occur where the defendant has exercised care, and the fact that they did occur in the particular case is presumptive evidence of negligence on the part of the defendant, and that as the defendant is in a better position than the plaintiff to know and show whether or not there was negligence, the burden is shifted to defendant to disprove negligence. The cases of *Uggla v. West End Street Railway Co.*, 160 Mass. 351; *Clarke v. Nassau Electric Ry. Co.*, 41 N. Y. Sup. 78; *Gilmore v. Brooklyn Ry. Co.*, 39 N. Y. Sup. 417; *Jones v. Union Ry. Co.*, 46 N. Y. Sup. 321, and *Mullen v. St. John*, 57 N. Y. 567 (a leading case on the subject), cited and relied on by plaintiff, assert this doctrine, but none of them hold that it is the duty of the defendant to keep the highway as safe after the erection of wires upon it as it was before. If such is the duty of the defendant then it may well be asked what defense could a defendant interpose in such a case? He could not show there had been no negligence on his part, for, in the language of the majority of the court "a most imperative duty, was placed upon

defendant in assuming the overhead use of the public alley with its wires to see that persons passing along the alley are not injured thereby;" and again, "It was a matter of the plainest duty for the defendant to see that the streets and alleys of the city along which by permission it was suffered to place its overhead wires for its own private gain were at all times maintained in the same condition as to safety from the danger of electricty as they were before its overhead use thereof was begun." Yet in spite of this duty with its resultant consequences, the majority opinion holds that proof that the wires were down in the highway and that the plaintiff was injured by coming in contact with them, makes only a prima facie case of negligence against defendant, and shifts the burden upon defendant to disprove negligence. Manifestly the defendant can not be liable at all events simply because the highway is not as safe from the dangers of electricity after the wires are strung above it as it was before they were put there, at the same time it has the right to disprove negligence. Against an absolute liability there is no defense. The fact that the majority opinion holds that once a prima facie case is made out, the burden shifts to defendant to disprove liability, establishes beyond cavil that there is no absolute liability, and that negligence is imputed to the defendant; and that he may rebut the imputation by showing that he exercised all the care commensurate with the dangers to be apprehended which careful and prudent men would have exercised under the circumstances. If he does this he has discharged his full duty to the public and is not liable. *Suburban Electric Co. v. Nugent*, 58 N. J. L. 658; *Hutchinson v. Boston Gas-Light Co.*, 122 Mass. 1. c. 222; *American Brewing Ass'n v. Talbot*, 141 Mo. 674. It is fair, therefore, to assume, that the majority opinion inadvertently announced an absolute liability, and

intended only to assert the doctrine commonly called res ipsa loquitur. The reasoning employed in this doctrine is doubtless based upon the common law rule of pleading that, "Less particularity is required when the facts lie more in the knowledge of the opposite party than of the party pleading." Andrews Stephen's Pleading, section 194. It is applicable only in rare cases. Ordinarily "the obligation of proving any fact lies upon the party who substantially asserts the affirmative of the issue." 1 Greenlf. on Ev. [15 Ed.], sec. 74. It is often loosely said the burden of proof shifts, but strictly speaking the burden of proof never shifts. In cases where the doctrine of res ipsa loquitur is applied, the presumption of negligence supplies the want of proof of negligence, and the defendant is obligated to rebut a presumption instead of evidence, but the case remains one of negligence, and the burden of proof is always on the plaintiff. The question always is, was the defendant negligent? The presumption of negligence arises only in cases where the circumstances surrounding the accident are such as to indicate that the accident could only have happened through some negligence of the defendant, and are inconsistent with any other theory. The case of *Hutchinson v. Boston Gas-Light Co.*, 122 Mass. 219, fairly illustrates the rule. In fact, when properly read, *Mullen v. St. John*, 57 N. Y. 567, asserts nothing more, although it is frequently referred to as holding a broader doctrine. Many cases might be cited illustrative of this doctrine, but for present purposes it will suffice to refer to those collated in 16 Am. and Eng. Ency. of Law, p. 449, note 1. As before stated, the rule simply supplies the want of proof by plaintiff of negligence of defendant by a legal presumption, arising from the nature of the accident and the circumstances surrounding it, that if care had been used by defendant, the accident would not have happened, and

as the facts lie more in the knowledge of the defendant than of the plaintiff, the burden of the evidence (not of the proof) is shifted to defendant to show that he was not guilty of negligence.   In bearing the burden thus cast upon him the defendant is not required to show that he used every absolutely necessary precaution, care and skill known to science, to prevent the happening of the accident (for this would make him liable in all cases except cases of inevitable accident) but it is sufficient to relieve him from liability if he shows that he used the degree of care commensurate with the dangers which men of prudence would have anticipated under the circumstances.   If a defendant makes such a showing by competent testimony, he overcomes the presumption of negligence, and if then the plaintiff introduces no countervailing testimony and does not impeach defendant's witnesses, the defendant is entitled to a judgment as a matter of law.   *Read v. Morse*, 34 Wis. 315; *C. B. & Q. R. R. Co. v. Stumps*, 55 Ill. 367,  375; *Hutchinson v. Boston Gas-Light Co.*, 122 Mass. 219-222; *Ward v. A. & P. Tel. Co.*, 71 N. Y. 81; *Allen v. A. & P. Tel. Co.*, 21 Hun. 22; *Suburban Electric Co. v. Nugent*, 58 N. J. L. 658. The same principle is applicable in ordinary civil cases arising in the commercial world.   *Hamilton v. Marks*, 63 Mo. 167; *Johnson v. McMurry*, 72 Mo. 278; *Henry v. Sneed*, 99 Mo. 407.

Applying these principles of law to the case at bar and giving the fullest force to the doctrine of res ipsa loquitur, it can not in my judgment, be successfully maintained that a presumption of negligence attaches to defendant.   Prior to the fire the wires were in good condition. If they had been down or grounded it would at once have been discovered by the lights going out in the engine house.  The fire alarm was sounded at 10:56 a. m.   When plaintiff's witnesses, who resided in the

neighborhood, arrived, the fire had progressed so that it was "pretty hot" in the alley. The fire department began to arrive in two or three minutes. At ten minutes after 11 a. m. the office of the City Supervisor of Electric Lighting was notified by Engine house No. 28, which was on the line of wire west of the fire, that the electric lights went out at 11 a. m. This establishes beyond doubt that the wires were not down at 10:56 when the alarm of fire was turned on, and also that the wires broke and fell at 11 a. m. The fire was then burning fiercely and so hot that the spectators had to retreat from the proximity of the fire. This fact is corroborated and confirmed by the testimony of James Cain, a pipeman in No. 17 company, and one of plaintiff's witnesses, that when his engine reached the fire and started down the alley, the bystanders warned them the wires were down. Andrew J. O'Reilly, the City Supervisor of Electric Lighting, a witness for plaintiff, testified to the proper and safe construction of the wires before the fire, that they were in good condition when he reached the fire, except those that were down, and that in his opinion the wires had not sagged or set fire to the stable, but that the insulation around the wires had been burned off and the wires broken by the heat; that there was no device known to art or science by which the defendant could have ascertained when only one of the wires composing the metallic arc or circuit was down, and that the wires were only charged with the amount of electricity required of defendant by its contract with the city to keep lights constantly burning in the engine houses and public institutions, by day as well as by night, and that defendant was notified at fifteen or twenty minutes after 11 o'clock that the lights were out at No. 28 engine house. Plaintiff's testimony further showed that her husband was killed about 22 or 23

minutes after the alarm was sounded, which would be about 18 or 19 minutes after 11 a. m.

Upon this showing no presumption of negligence on defendant's part can properly be indulged. Admitting that properly erected and maintained wires do not ordinarily break in two and fall without some negligence on the part of those having them in charge, it is equally true that the rubber insulation around any wire will burn when subjected to heat and that the wires themselves will also burn and break when so subjected. That it was the fire which burnt the wires and not the wires which caused the fire, and that the wires did not fall until after the fire affected them, is clearly shown, by the fact testified to by plaintiff's witness O'Reilly, that when he reached the fire before it was out (it burned out in about twenty minutes) he found seven wires down, one telephone wire belonging to the city fire alarm system, and six copper wires belonging to defendant, of which five were small wires and had no current of electricity on them except at night, and then only enough to shake a person up and burn him, but not half enough to kill him, and one, the large wire, which carried 2200 or 2300 volts all the time, day and night. It was therefore this large wire which caused the accident in this case. Manifestly therefore it was the fire which burnt the seven wires in two, for it can not be presumed that all seven wires went on a strike simultaneously, of their own accord, without any outside interference. This being the condition presented by plaintiff's case, and the circumstances surrounding the accident, instead of a presumption of negligence attaching to defendant, it appears plainly and affirmatively that the accident was not caused by any defective construction or any improper or negligent maintenance of its wires, but by the fire, and as defendant was not notified that the wires were down until fifteen or twenty

minutes after 11 a. m., and as the accident occurred at 18 or 19 minutes after 11 a. m. the defendant had no actual notice of the condition of its wires at that point, and as sufficient time had not elapsed after the wires fell and before the accident occurred for the defendant to have ascertained the fact by the exercise of the greatest care, no notice can be presumed, and hence it follows that this is not a proper case for the application of the doctrine of res ipsa loquitur, but that instead of its being a case of presumed negligence of defendant, it is clearly apparent from plaintiff's testimony that defendant was not negligent, and is in no wise liable for the death of plaintiff's husband.

Therefore, in my judgment, the circuit court erred in overruling defendant's demurrer to the evidence at the close of plaintiff's case.

## II.

Assuming, however, for the purposes of further discussion of the case, that a presumption of negligence arises from the facts and circumstances shown by plaintiff, and that the burden of the evidence was shifted to defendant to exonerate itself, by showing that it had taken care commensurate with the danger, which men of prudence would have expected under the circumstances, it is practically conceded by the majority opinion, and will be at once conceded by every one who examines the defendant's proofs, that the defendant proved that it was guilty of absolutely no negligence whatever. It showed by the testimony of Kneightley, Beyer, Wordsworth, Keil, Miss Josie Keil, Fitzgerald and Foster, all reputable witnesses, that they were at the fire before the fire department arrived and before the alarm was turned on, and that the wires were all properly up on the poles when they reached the fire, and that they saw the wires burn in two, curl up and

fall after it became too hot for the people to remain in close proximity to the fire. It also showed that the wires and circuits before the fire were in first class condition; that there is no device known to science which will indicate when only one wire is down (there was only one of the two composing the metallic current, down in this instance); that the first notice defendant received that the wire was down was at seven minutes past twelve o'clock, and it sent, at once, and had it repaired; that it received the alarm of fire which was turned in from the box at Leffingwell avenue and Dickson street, and that defendant had no "live" wires in that neighborhood, and had no idea that there was any disturbance with the wires until the report aforesaid was received. The plaintiff introduced no evidence in rebuttal.

The majority opinion concedes that the defendant proved that it was not negligent. But it is held that the jury, under our Constitution and laws, are the sole judges of all questions of fact and of the credibility of all witnesses, and that they had the right to say, "It fails to convince us; it fails to satisfy our minds; we do not believe it," and that this is true notwithstanding the witnesses testify positively, are not contradicted and no attempt is made to impeach them. The majority opinion concedes that this court held otherwise in *Reichenbach v. Ellerbe*, 115 Mo. 588, but says that the converse of that proposition was held by this court as early as the cases of *Bryan v. Wear*, 4 Mo. 106, and *McAfee v. Ryan*, 11 Mo. 365.

It is true that *Bryan v. Wear* and *McAfee v. Ryan* so decide, but the principles so announced have long since been overruled, by implication at least, in this State, and the rule, so clearly and forcibly announced by Brace, J., in rendering the opinion of this court in *Reichenbach v. Ellerbe* is now the settled law of our

State. In speaking of verdicts rendered in such a state of the case, he aptly says: "Such a verdict can be accounted for only on the ground of ignorance, partiality, prejudice or passion, and under the repeated rulings of this court, can not be permitted to stand. *Long v. Moon*, 107 Mo. 334; *Caruth v. Richeson*, 96 Mo. 186; *Avery v. Fitzgerald*, 94 Mo. 207; *Garrett v. Greenwell*, 92 Mo. 120; *Spohn v. Railroad*, 87 Mo. 74; *Whitsett v. Ranson*, 79 Mo. 258. 'When the evidence is of that character that the trial judge would have a a plain duty to perform in setting aside the verdict as unsupported by the evidence, it is his duty and prerogative to interfere before submission to the jury and direct a verdict for defendant.' *Jackson v. Hardin*, 83 Mo. 175; *Powell v. Railroad*, 76 Mo. 80." See, also, *Ackley v. Straehlin*, 56 Mo. 558, and *Hearne v. Keath*, 63 Mo. 84.

In addition to these cases attention may also be called to the following: In *Hipsley v. Railroad*, 88 Mo. 348, it was held that this court would reverse a judgment where the verdict is so clearly against the weight of evidence as to show passion or prejudice. In *Wilson v. Albert*, 89 Mo. 537, this court said that while it would not weigh evidence in law cases, yet it would interfere where there was no evidence to support the verdict. In *Davis v. Fox*, 59 Mo. 125 and in *Cornet v. Bertelsmann*, 61 Mo. 118, this court held it would interfere on questions of fact where the judgment below is clearly erroneous. In *McCartney v. Finnell*, 106 Mo. 445, it was held that this court would look into the evidence and would reverse the judgment below where apparent injustice had been done. In *Bruen v. K. C. Fair Ass'n*, 40 Mo. App. 425, it was held that where the material facts were undisputed it was the duty of the appellate court to review the action of the trial court and to render such judgment as the

facts warranted. In *Rhodes v. Farish*, 16 Mo. App. 430, it was held that where the defense was the statute of limitations, and the evidence in support thereof was definite, undisputed and not open to suspicion, the appellate court would direct the proper judgment to be entered by the trial court. In *Hewitt v. Doherty*, 25 Mo. App. 326, it was held that a verdict for one party where the conceded facts show that the adverse party is entitled to a judgment, will be vacated on appeal as being unsupported by the evidence. The same rule obtains in other jurisdictions. In *Railroad v. Stumps*, 55 Ill. l. c. 375, it is said: "The decision of this case, it is true, involves the question of the credibility of witnesses, and the jury are peculiarly the judges of that question; still they have not an arbitrary discretion in this respect. This court has said a jury can not, willfully, nor from mere caprice, disregard the testimony of an unimpeached witness." In *Read v. Morse*, 34 Wis. l. c. 319, it is said: "But we think the court erred in submitting the question to the jury in any form, as to whether the boat was provided with the necessary means and appliances to prevent escape of fire. After a careful examination, we think the uncontradicted testimony proves that the boat was properly equipped. * * * Such being the case, it was error to submit the case to the jury." In *Wise v. Freshly*, 3 McCord l. c. 548, it is said. "Where evidence is of a doubtful character, or where there is a conflict among the witnesses of the plaintiff and defendant, the juries are the proper persons to decide. But they have no such arbitrary and capricious power as to give a citizen one cent for property indisputably proved to be worth five hundred or one thousand dollars." The same rule is laid down in 1 Greenleaf on Ev. (15th Ed.) §74, and is supported by the numerous cases and illustrations contained in note "*a*" to the text. See, also, *Turner v. Haar*, 114 Mo. 335.

In *Seibert v. Erie Railway Co.*, 49 Barb. 1. c. 586, it is said: "The testimony of these two witnesses is clear, positive and circumstantial; they could not be mistaken. Their testimony is true, or they both committed willful and corrupt perjury. I think this jury, so far as anything to the contrary appears in this case, were bound to give credit to their testimony. It was not contradicted; it was really no contradiction for the plaintiff to say he did not hear the whistle or bell. They were not impeached or in anyway discredited. The positive testimony of an unimpeached, uncontradicted witness can not be discredited, or disregarded arbitrarily or capriciously by court or jury. *Lomer v. Meeker*, 25 N. Y. 361. If juries are permitted to discredit or disregard such testimony, there is no safety in the administration of justice, and parties might just as well let the result of a litigation abide the cast of a die, or a game of chance. It belongs to a jury, I admit, in considering the weight of evidence, to pass upon the credit due to the respective witnesses; but this does not imply that they may, without reasonable or justifiable ground, disbelieve any witness. They have no right to discredit an unimpeached, uncontradicted witness, who testifies fairly, and gives clear, rational, consistent and relevant testimony. For judicial purposes, all witnesses stand upon a par, and must be believed in their testimony, unless discredited, by the inconsistency, incredibility or improbabilities of their statements on cross-examination, or otherwise contradicted by other witnesses or impeached in respect to their general character for integrity or truth." And because the jury arbitrarily disregarded the uncontradicted testimony of the unimpeached witnesses in the case, the judgment was reversed and a new trial awarded. To the same effect, see *Jackson v. Hardin*, 83 Mo. 175; *Hite v. Railroad*, 130 Mo. 132; *Payne v.*

*Railroad*, 136 Mo. 562; *Morgan v. Durfee*, 69 Mo. 469; *Travelers Ins. Co. v. Selden*, 26 Ins. L. J. 710.

In *Crawford v. The State*, 44 Ala. 382, it appeared that the lower court, in referring to a portion of the testimony for the defense, said in its charge to the jury: "Yet you are not bound to believe one word of this testimony, unless you are satisfied it is true, and of this you are the judges," and upon appeal the Supreme Court said: "This clause of the charge must have some meaning. It can not be construed in support of the veracity of the testimony referred to. It may be construed into an assault upon it, and it would justify the jury in its rejection as unworthy of any influence upon their verdict. In this view of it, it would be erroneous. If the testimony delivered upon the trial is unimpeached, either by the manner of the witness, his knowledge of the facts, his connection with the parties or by contradictions, or for some other legal reason, the jury must treat it as true. They have no legal right causelessly to discredit any portion of the evidence, unless there are legal grounds for such a discrediting. Any other course would imperil the fairness and impartiality of the trial. If the jury can capriciously and causelessly discredit a portion of the testimony for the defense, they may discredit the whole. If the law exists, as intimated by the learned judge on the trial below, it exists without limit; and it may be applied to the testimony of the defense or to the testimony of the prosecution. This would give the jury power to convict or to acquit according to their discretion, and not according to the evidence. This is not a correct statement of their duty. They must try the issue joined according to the evidence."

In *People v. Lyons*, 51 Mich. 215, the case presented the converse of the proposition. The lower court instructed the jury that "although a witness may

be completely impeached they might still believe him;'' or in other words, as the Supreme Court put it, that they were at liberty to convict the defendant on the testimony of one who was shown, by impeaching evidence, to be unworthy of belief. The Supreme Court said of this charge: "Of course, it was not the intention of the circuit judge to convey the idea to the jury, but unfortunately his language was so chosen as to carry that meaning," and granted a new trial to the defendant.

In a word, the reason is this: juries try *questions* of fact; that is, controversies about the facts. Where there is no controversy, meaning an affirmance of a fact on one side and a denial on the other, there is no *question* as to the facts. If the facts are shown by competent evidence on one side, and the evidence is not contradicted on the other, and there is no attempt to impeach the witnesses, there is no *question* of fact involved in the case, but a simple question of law is presented. To permit a jury to say that it will not believe competent, uncontradicted and unimpeached testimony and to return a verdict in the teeth of such evidence, is to give the jury plenary power to take a man's life or property as caprice or willfulness may dictate. If this is the power of a jury in this State, then courts are unnecessary, and the study of the law a waste of time, for what shall it profit us to carefully sift the grain of competent testimony from the bushel of chaff of hearsay testimony, if after it is all done, the jury can capriciously, arbitrarily, perhaps wantonly, say "We don't believe it," and find for the litigant who has introduced no testimony and has not impeached the testimony that has been introduced. Briefly, bluntly, I say this is not the law.

For these reasons I dissent from the second proposition decided by the majority opinion, and think it

was the duty of the circuit court to give the instruction asked by defendant at the close of the whole case. It follows that in my opinion the judgment of the circuit court ought to be reversed. SHERWOOD and BRACE, JJ., concur in all that has been said herein.

### SEPARATE OPINION.

SHERWOOD, J.—To the foregoing elaborate and exhaustive opinion, I desire to add: That *outside of this State*, "without variation or shadow of turning," the mere conjunction of accident and injury affords no basis for a cause of action; that if a defect occurs from which an injury results, no cause of action, *prima facie* or otherwise, arises, unless the party whose duty it was to repair that defect had either actual or imputed notice thereof. In this case the evidence shows no actual notice, and also shows no such lapse of time as to amount to imputed notice. Where then is your so-called *prima facie* case?