## THOMAS M. CHINN, Respondent, v. CHICAGO & ALTON RAILWAY COMPANY, Appellant.

Kansas City Court of Appeals, May 25, 1903.

1. **Common Carriers: DELAYED SHIPMENT: CAR FAMINE: EVIDENCE: DEMURRER.** Evidence relating to a car famine sufficient to excuse the delay in shipping stock offered to the defendant carrier is reviewed and held sufficient to send the question of defendant's liability to the jury.

2. **———: EVIDENCE: JUDICIAL NOTICE: LIVE STOCK TRAFFIC.** The courts may take judicial notice that the live stock traffic increases yearly.

3. **Jury: CREDIBILITY OF WITNESSES.** Where parol evidence is relied upon to support an action or defense, the issue of fact should be submitted to the jury though the evidence may be all one way, since the credibility of the witness is for the jury, and the court may not tell them to believe one set of witnesses and not another.

4. **Trial and Appellate Practice: VERDICT: ISSUES: WITHDRAWING INSTRUCTION: WAIVER.** Where an issue is withdrawn from the consideration of the jury the party withdrawing the same can not complain that the verdict does not pass upon such issue.

Appeal from Lafayette Circuit Court.—*Hon. Samuel Davis,* Judge.

AFFIRMED.

*F. Houston* for appellant.

(1) The appellant, as a common carrier of freight and live stock, is only obliged to provide cars sufficient to haul such freight as would ordinarily be tendered it for transportation. It is not bound to anticipate an unusual influx of business, nor to anticipate an increased demand for cars for any kind of business at any particular portion of the year. McGrew v. Railway, 109 Mo. 580, 586; Railroad v. Rea, 18 Ill. 488; s. c., 68 Am. Dec. 574; Railroad v. Wolcott, 141 Ind. 267; Railroad v. Racer, 10 Ind. App. 503; Railroad v. Coal Co., 99 Ky. 217; Railroad v. Burrows, 33 Mich. 6; Newport News v. Reed, 10 Ky. L. Rep. 1016; Richardson v. Railroad, 61. Wis. 596; Railroad v. Smith, 63 Tex. 322; Railroad v. Campbell, 91 Tex. 551; s. c., 43 L. R. A. 225. (2) And the amount of business ordinarily done by a railroad is the only proper measure of its obligation to furnish transportation or cars. Ballentine v. Railroad, 40 Mo. 491; Dawson v. Railroad, 79 Mo. 293. (3) For the same reasons that the court erred in refusing defendant's demurrer to all the evidence, the court erred in giving all or any of the instructions asked by plaintiff. The plaintiff offered no evidence whatever, either direct or in rebuttal, to prove that the delay in furnishing cars was unreasonable under the conditions prevailing at the time, while testimony of B. B. Barry, C. J. Fellows, Mr. Hubbard and J. F. Emery was undisputed and conclusive on this question. See authorities, supra. (4) The evidence for defendant being uncontradicted and abundantly sustaining defendant's defense, the jury disregarded the instructions given for defendant in rendering their verdict. They were either actuated by prejudice or they misunderstood the instructions, or they willfully disregarded them. In doing either they

found against the evidence, for the wrong party, and against the instructions given for defendant.

*Alexander Graves* for respondent.

(1)   This demurrer could not have been sustained. The jury was not bound by defendant's evidence on any single point, or on the whole case, even though not contradicted.   This is the settled law in Missouri from the organization of the Supreme Court to date.   Wolf v. Campbell, 110 Mo. 120; Gannon v. Gas Co., 145 Mo. 515, 517, 518.   (2)   Everything proves the jury could not have found otherwise than they did and if the suggestion of prejudice is made we apply the rule in Hollenbeck v. Railway, 114 Mo. 112.

SMITH, P. J.—The petition is in two counts, the first of which is based on a claim made for damages occasioned by the unreasonable delay and detention in shipping a certain number of cattle, of which plaintiff was the owner, from defendant's Mayview station to Kansas City, in consequence of which, such cattle sustained an extra shrinkage in weight and depreciation in value; and the second is based on a claim made for damages occasioned by the unreasonable delay and detention by defendant in shipping a certain number of hogs, of which plaintiff was owner, at its Mayview station, to Bloomington and East St. Louis, in the State of Illinois, in consequence of which such hogs sustained extra shrinkage in weight and depreciation in value, etc.

After a general denial, the answer to the first count alleges that defendant kept a large number of extra livestock cars on hand which were ordinarily and reasonably sufficient to meet all the demands of past experience made by farmers and shippers along its lines; that owing to the extreme drought prevailing in the states through which its lines were located and operated, an unusual and unprecedented number of all kinds of live stock were offered for shipment over its lines, by reason

whereof it was unable to promptly meet all the demands made upon it for stock cars, though it used every possible effort to do so; that a "car famine" prevailed, and in consequence of which it was unable to furnish the plaintiff the cars required until the 31st day of July, 1901—the date the shipment was made.

The answer to the second count was similar in allegation to the first. The replication contravened the new matter pleaded by the answer.

There was a trial and at the conclusion of all the evidence the defendant interposed a demurrer thereto, which was by the court denied. The question thus raised is whether or not the evidence adduced by the plaintiff established his *prima facie* case, entitling him to go to the jury.

On looking at it we find that it tends to prove that the plaintiff was the owner of 73 head of fat cattle and 148 head of fat hogs, and that on July 26th, 1901, he requested defendant to furnish him four cars on the 29th at its Mayview station in which to ship his cattle to the Kansas City market; that on the 13th day of July he requested defendant to furnish a car on the 16th in which to ship a part of the hogs to Bloomington, and on the 15th he still further requested the defendant to furnish another car for the 18th to go to East St. Louis.

It appears further that two days after he had requested the cattle cars he went to the defendant's station agent and told him that he wanted to know for certain whether the cars were going to be furnished at the time for which they had been requested, for if not he wanted to stop his cattle where there was feed and water, and thereupon the defendant's agent stated that he felt sure he—plaintiff—would get the cars, as he had requested them in ample time. On the day the cars had been requested the plaintiff drove his cattle, weighed them on defendant's scales, and put them in its stock pens, relying upon the assurance of the defendant's agent that the cars would be furnished to ship out on as

requested. The cattle remained in the defendant's pens from 8 a. m., July 29th, until 6:30 p. m., the 31st, or 58 hours, without food, water or shelter. It further appears that when the cattle reached the Kansas City market on the 31st they had sustained extraordinary shrinkage and were greatly depreciated in value. They were in that condition which is known in market parlance as "stale cattle." The shrinkage and depreciation as alleged in the petition was well established by the evidence. The evidence was amply sufficient to carry the case to the jury on the issue as to whether or not the detention and delay was unreasonable, and as to whether or not the shrinkage and depreciation was occasioned by such detention and delay. The hogs were detained from July 16th to the 19th, 84 hours, and what has just been said in respect to the detention and delay of the cattle is equally applicable to them.

The contradictory evidence adduced by the defendant in support of the negative of the issue just referred to must, in the determination of its demurrer, be regarded as waived by it, or as if it had never been introduced. The plaintiff's *prima facie* case having been established by practically uncontroverted evidence, it devolved upon the defendant to establish the excusatory defense pleaded by it. The facts pleaded as constituting this defense were controverted by the replication. While the defendant adduced evidence tending to support its special defense, it will not do to say this was not contradicted by any evidence of the plaintiff.

As negativing the defense of "car famine," the plaintiff testified that on the evening of the 29th of July from the repeated assurances given by the defendant's agent he felt so sure that the cars would be furnished him that evening he took a passenger train for Kansas City, expecting his cattle to follow. That night his hand in charge of the cattle telephoned him that no cars had been furnished; and he called up Starr, defendant's superintendent, who informed him that he had a train of empties at Slater (about 25 miles east of Mayview) and

that he would have his cattle loaded out early the next morning (July 30th). But he did not do this, and the cattle did not arrive in Kansas City until 7:30 a. m., July 31st, the run being only four hours. Besides this train load of empties, which superintendent Starr said he had at Slater, plaintiff counted three empty stock cars standing idle at Odessa and another at Independence and no stock in the pens at either place. This he saw himself as he went up on the passenger the evening of the 29th. So far from a car famine, there was a train load of empties at Slater and others scattered idly along the route from Mayview to Kansas City.

Plaintiff's testimony graphically explains the hog situation as follows: "Q. State to the jury with regard to the shipment of these hogs to Bloomington and East St. Louis? A. I ordered my cars on the morning of the 13th, one car for Tuesday, the 16th, to go to Bloomington, and on Monday, the 15th, another car for the 18th, to go to East St. Louis. The hogs came in on Tuesday morning. Q. What day of the month was that? A. Tuesday was the 16th, but we did not get the car that day. I asked for cars Wednesday. Wednesday could not get cars. Wednesday night I telegraphed Mr. Starr and asked him for cars, telling him I had no water and feed there. He did not answer. I got no answer. Wednesday night I went to the telephone and called Mr. Starr up and told him I had no feed and water and had another car coming the 18th, *and if I was not going to get the cars I wanted to know it so I could haul them to Lexington to the Missouri Pacific,* also I would have to move the others. He told me I would not have to do that as he thought he could get me the cars next day. Q. What happened then? A. The next day would be Thursday, he said he thought he could get them. I talked with the agent several times during the day about the cars and he said they would not talk to him. Q. That was the Mayview agent? A. Yes, sir. Thursday night I telegraphed

to Mr. Starr that the stock was still in the pens without feed and water, that was all I said to him. Friday morning I still heard nothing. The agent said he could not hear anything. Q. What day would that be? A. The 19th. *I telegraphed to the railroad commissioner at Jefferson City if they would not please aid me. I got two cars that night.*"

The *uncontradicted* evidence of Wm. Kelley and W. E. Johnson, two large stock shippers, was, that at the station of Higginsville, only seven miles from Mayview, where they shipped from, and where the Missouri Pacific is a rival of defendant, they were getting cars from defendant in abundance all through this month and at especially at the times when defendant was holding and delaying plaintiff's shipments from Mayview. They also testified that every shipper at Higginsville was fully supplied by defendant all this time. Again, the defendant's own evidence shows that it was using too many of its stock cars off its western division extending from Roodhouse to Kansas City (which the evidence showed it furnished 50 per cent of its stock traffic) in supplying its stock cars to the Chicago, Lake Shore & Eastern railroad which had a contract for shipping rails from the Illinois Steel Company at South Chicago to M., K. & T. system down in Texas.

Mr. Fellows, superintendent of car service on the Chicago & Alton railroad, testified for defendant: "Q. It seems he (A. D. Bethard, superintendent of the M., K. & T. railroad car service) telegraphed you as follows from Denison: 'We have returned 25 your stock cars and are tracing for balance, and will get them hurried to you as quick as possible. Those just received will be hurried to destination and released soon as possible and returned to you.' So that it was only two days preceding the time when Mr. Chinn, the plaintiff here, was wanting cars at Mayview, and you had your stock cars according to this telegram scattered down there and Bethard hunting them up? This was

the state of affairs, was it not? A. We had some of our cars down there, yes, sir. Q. The western division was demanding stock cars and you could not supply the demand? A. That is right. Q. Now, Mr. Fellows, if your stock cars had not been employed in the steel business, the transportation of steel rails, you could have met the demand for the stock and the facilities would have been better? A. Certainly; if they had run the cars back empty, the demand then could have been supplied. Q. The demand then could have been supplied if they had run them back empty? A. Yes, sir; after they had got the rails if they had sent them back empty.''

Mr. Fellows further testified that in the year 1900 the C. & A. had on hand 619 stock cars, while in the year 1901 it had only 560 stock cars. It is a matter of current history—of which we may take notice—that the live stock traffic increases yearly, and yet it seems that the defendant, according to this evidence of its agent, had decreased its facilities as a common carrier for handling the live stock business. Assuming that every fact alleged in the defendant's answer as constituting its special defense had been proved, would any court, in the face of the plaintiff's countervailing evidence which we have just noticed, have been warranted in peremptorily instructing the jury to find for the defendant? Here was a controverted issue of fact, and such being the case it would have been a glaring invasion of the province of the jury by the court to have given such an instruction.

There are, of course, cases where such an instruction may with propriety be given, as for example where the plaintiff's case, under the pleadings, turns wholly on the construction of a contract, the construction of which is simply a question of law, or, where the answer admits the plaintiff's cause of action and sets up new matter as a defense, and the evidence fails to make out a *prima facie* defense. Ordinarily, when the plaintiff

produces parol evidence to support his action, or when the defendant has pleaded new matter as a defense and produces parol evidence to support such defense, the issue of fact should be submitted to the jury. The evidence may be all one way, yet it is for the jury to say whether they believe the witness or not. The court has no right to tell the jury that they must believe the witnesses of one party or disbelieve those of the other. This has been the well settled rule in this State for a long time. Bryan v. Wear, 4 Mo. 106; Vaulx v. Campbell, 8 Mo. 224; Gregory v. Chambers, 78 Mo. 294; Wolff v. Campbell, 110 Mo. 1. c. 120; Gannon v. Gas Co., 145 Mo. 515. Accordingly the deduction is irresistible that the action of the court in refusing the defendant's peremptory instruction is subject to no just criticism.

The defendant further objects that the jury did not render a verdict on all the issues made by the pleadings. It is true that in each count of the petition there was coupled with the allegation of unreasonableness, detention and delay, that of discrimination of the defendant against the plaintiff as a shipper, but this latter issue at the conclusion of the evidence was by an instruction given at the defendant's request, withdrawn from the jury. It does not therefore lie in the defendant's mouth to complain that the jury did not render a verdict on all the issues made by the pleadings.

Our attention has been called to no vice in any of the plaintiff's instructions. Those given for defendant were extremely liberal to it. The petition sufficiently states a cause of action and is supported by evidence quite ample to support the verdict, and it must follow that the judgment, which was for plaintiff, must be affirmed. All concur.