BEULAH CLONTS et al., Respondents, v. LACLEDE GAS LIGHT COMPANY, Appellant.

St. Louis Court of Appeals, November 7, 1911.

1. **ELECTRICITY: Master and Servant: Action for Death of Servant: Pleading: Petition Construed.** A petition, in an action for the death of a servant by electric shock, which alleges that decedent, while operating an electric elevator by means of an uninsulated cable, was killed by electricity communicated by the cable, that the master negligently permitted large quantities of electricity dangerous to life to pervade its

Clonts et al. v. Gas Light Co.

premises and the elevator, and negligently failed to protect the cable, the elevator and the person of decedent against such electricity by proper and usual insulation and appliances, that, by reason of such roving electricity and the master's negligent failure to provide such insulation and appliances, the elevator and all its parts were liable to become charged with electricity and was a dangerous place for decedent to work in, that the master knew, or by exercising due care could have known, of the presence of electricity on said premises and that the elevator, cable and person of decedent were not supplied with proper safeguards to protect the same against the invasion of said electricity, that the electricity which entered the body of decedent was roving and uncontrolled and defendant had knowingly and negligently permitted it to pervade its said premises, elevator and cable, and that the death of decedent ,was due to the master's negligent failure to provide proper safeguards and appliances against said roving and uncontrolled currents, states a cause of action predicated on the failure of the master to exercise the utmost care to safeguard the elevator, cable and person of decedent against roving and uncontrolled electricity which pervaded its premises with its knowledge.

2. **TRIAL PRACTICE: Demurrer to Evidence: Conflicting Testimony.** Where there is substantial evidence to sustain the averments of the petition, the case is for the jury notwithstanding contrary proof for the defendant may appear quite conclusive.

3. **MASTER AND SERVANT: Electricity: Action for Death of Servant: Notice to Master of Defects: Sufficiency of Evidence.** In an action for the death of a servant by electric shock communicated by an uninsulated cable with which he was operating an electric elevator, evidence that the master's superior officer had been notified several times during the months preceding the death of decedent that the cable was charged with electricity was sufficient to establish the fact that the master had notice that electricity was leaking from some source into the cable.

4. **————: Electricity: Care Required.** A master using electricity in his work must exercise the utmost diligence to prevent injury to his servants.

5. **ELECTRICITY: Master and Servant: Action for Death of Servant: Sufficiency of Evidence.** In an action for the death of a servant by electric shock while operating an electric elevator by means of an uninsulated cable, where the petition counted on the theory that the master failed to exercise the utmost care to safeguard the elevator, cable and person of decedent against roving and uncontrolled electricity which pervaded its premises with its knowledge, evidence *held* to

justify a finding that decedent was killed by electricity, which pervaded the cable and found its source in electricity provided by the master for the operation of the elevator, and that the master knew that such electricity pervaded the cable a sufficient length of time prior to the death of decedent to have enabled it to have protected the cable by the use of proper appliances; and hence it is *held*, that the evidence supported the averments of the petition and was sufficient to warrant a verdict for plaintiff.

6. **EVIDENCE: Uncontradicted Testimony: Effect: Trial Practice.** The mere fact that a party does not put on evidence to contradict that of his adversary does not operate, as a matter of law, to concede that such evidence is true.

7. ———: **Documentary Evidence: Construction: Trial Practice.** It is the function of the court to construe documentary evidence.

8. **TRIAL PRACTICE: Question for Jury: Uncontradicted Evidence.** The weight of the testimony of the witnesses for the party having the burden of proof is for the jury, and the court may not declare, as a matter of law, that a prima facie case established by such testimony is overthrown by uncontradicted testimony of the adverse party.

9. **ELECTRICITY: Master and Servant: Action for Death of Servant: Instructions.** In an action for the death of a servant by electric shock communicated by an uninsulated cable with which he was operating an electric elevator, an instruction given for plaintiff *held* to be sound in doctrine, although somewhat abstract.

10. ———: ———: ———: ———. An instruction using the word "roving," in connection with electricity, is not objectionable for failing to define the word, under the rule that the meaning of words in common use and which have no special technical meaning in the connection in which they are used, need not be explained.

11. ———: ———: ———: **Instructions: Failure to Define "Negligence."** In an action for the death of a servant by electric shock communicated by an uninsulated cable with which he was operating an electric elevator, an instruction given for plaintiff, which, after hypothesizing certain facts, directed the jury to find for plaintiff, if a powerful current of electricity, which occasioned the death of decedent, entered his body from the cable by reason of "the negligence of defendant as defined in this and other instructions", was not erroneous for failure to define the term "negligence," since a departure has been made in this state from the standard definition of that term in relation to injuries resulting from electricity, so

that persons who use this agency must exercise the utmost care to prevent injury to others rightfully about it, and the instruction submitted this theory as the standard by which defendant's liability was to be determined.

12. INSTRUCTIONS: Defining Terms: Words in Common Use. The meaning of words in common use and which have no special technical meaning in the connection in which they are used in an instruction need not be explained to the jury.

13. NEGLIGENCE: Evidence: Proof of Subsequent Repairs. In an action for personal injuries, evidence that the defect alleged to have caused the injuries was subsequently repaired is incompetent, since the taking of such precautions against the future is not to be construed as an admission of responsibility for the past.

14. TRIAL PRACTICE: Evidence: Waiver of Incompetent Evidence. Where, in an action for the death of a servant, the master, on the examination of its witnesses in chief, showed subsequent repairs of the appliances causing the death, it was competent for plaintiff to cross-examine the witnesses as to the extent and nature of such repairs.

Appeal from St. Louis City Circuit Court.—*Hon. Charles Claflin Allen*, Judge.

AFFIRMED.

*Percy Werner* for appellant.

*E. C. Crow, Guy E. Golterman* and *Jeffries & Corum* for respondents.

NORTONI, J.—The appeal in this case was prosecuted to the Supreme Court, but the case was transferred to this court under the provisions of an act of the Legislature, approved June 12, 1909 (See Laws of Missouri, 1909, page 397; see, also, Sec. 3937, R. S. 1909); and was thereafter transferred by this court to the Springfield Court of Appeals under the provisions of an act of the Legislature, approved June 12, 1909. [See Laws of Missouri 1909, page 396; see, also, Sec. 3939, R. S. 1909.] In due time the case was

disposed of by the Springfield Court of Appeals in an opinion prepared by Presiding Judge NIXON of that court, as will appear by reference to Clonts v. Laclede Gas Light Co., 144 Mo. App. 582, 129 S. W. 238. Subsequently, the Supreme Court declared the legislative act approved June 12, 1909 (Laws of Missouri 1909, page 396; Sec. 3939, R. S. 1909), which purported to authorize the transfer of cases from this court to the Springfield Court, to be unconstitutional, as will appear by reference to the cases of State ex rel. Dunham v. Nixon, 232 Mo. 98, 133 S. W. 336; State ex rel. St. Louis Dressed Beef, etc., Co. v. Nixon, 232 Mo. 496, 134 S. W. 538; State ex rel. O'Malley v. Nixon, 233 Mo. 345, 138 S. W. 342. The cause was thereafter transferred by the Springfield Court of Appeals to this court, on the theory that the jurisdiction of the appeal continued to reside here and that proceedings had in the Springfield Court with reference thereto were *coram non judice*.

The case has been argued and submitted here and duly considered. Upon reading the record and considering the arguments for a reversal of the judgment, we find ourselves unable to concur in the views of the Springfield Court as expressed in the opinion referred to. [See Clonts v. Laclede Gas Light Co., 144 Mo. App. 582, 129 S. W. 238.] Indeed, as we read the record, some of the relevant facts tending to show liability on the part of defendant were neither stated nor weighed by the Springfield Court in its opinion. Those facts appear principally in plaintiff's additional abstract, which may have been inadvertently overlooked. The case will, therefore, be re-stated, to the end of developing the facts as we ascertain them to be from a reading of both the defendant's abstract and the additional one filed by plaintiff.

The suit is for damages accrued to plaintiffs through the alleged negligence of defendant, which resulted in the death of their father. It proceeds by

their next friend in behalf of plaintiffs, Cordie, aged eight, and Beulah, aged five, infant daughters of S. C. Clonts, a widower, who came to his death from a charge of electricity entering his body while engaged in operating defendant's elevator. Plaintiffs recovered a verdict and judgment of $5000, from which defendant prosecutes the appeal. Defendant, incorporated, owns and conducts an extensive business as a manufacturer of gas and generator of electricity which it sells and transmits to its patrons in the city of St. Louis. At the time of his death, S. C. Clonts, father of plaintiffs, was in defendant's employ, engaged in removing debris from one floor to another of defendant's Station A at Second and Convent streets in St. Louis. He used a wheelbarrow in connection with this duty, and it appears he was required to transfer the wheelbarrow loads of debris from one floor of the building to another by means of an electric elevator which defendant maintained therein. This electric elevator was operated by means of a tiller rope, which is described in the evidence as an uninsulated iron or steel cable passing perpendicularly through the elevator around the sheave wheel in the bottom of the shaft to the drum, or motive power, above. To move the elevator up or down, it was Clonts' duty to grasp this uninsulated iron or steel cable, or tiller rope, with sufficient force to turn on the power. Deceased approached the elevator with a wheelbarrow loaded with debris and grasped the tiller rope, as was usual, for the purpose of moving the carriage, when a charge of electricity was communicated from the uninsulated cable, or tiller rope, into his body with sufficient force to occasion his instant death. The elevator, which Clonts was so occasionally required to operate, was propelled by an electric motor which employed a direct electric current of 500 volts. This power, though generated on the premises, was communicated to the elevator by means of an insulated wire, or cable, which came into

the building from outside and connected with other like wires of defendant. The petition avers that "at all times hereinafter mentioned defendant company negligently permitted large quantities of roving electricity dangerous to human life to pervade its said premises and said elevator and every part thereof." It then avers that at all times while said electricity was so roving and pervading defendant's premises, defendant negligently failed and omitted to protect said iron tiller rope and elevator and the person of deceased, S. C. Clonts, against said electricity by proper and usual insulation and appliances or other suitable safeguards. "That by reason of the presence of said roving electricity and by reason of defendant's said negligent failure to provide said iron tiller rope and said elevator and the person of said deceased with proper safeguards against said roving electricity, said elevator and all parts thereof were at all times liable to become charged with large quantities of electricity and was a dangerous and unsafe place for said S. C. Clonts to perform his said duties as laborer at defendant's said plant as aforesaid. That defendant at all times knew or by the exercise of due care might have known of the presence of said electricity on said premises and of the fact that said elevator, iron tiller rope and the person of said deceased were not supplied with proper safeguards to protect the same against invasion of said electricity and said impending peril to the life of deceased as aforesaid." It then avers that while Clonts was engaged in the line of his duty on September 6, 1905, and while in the act of grasping the iron or steel tiller rope of the elevator with the purpose to move it, he received into his body from such rope a powerful current of electricity, which caused his instant death. The charging portion of the petition then concludes as follows: "Plaintiffs charge the fact to be that the electricity which so entered the body of said S. C. Clonts was roving and uncontrolled electricity,

which defendant had knowingly and negligently permitted to pervade its said premises, elevator and iron tiller rope; that the death of said S. C. Clonts was directly due to defendant's negligent failure to protect said iron tiller rope, elevator and person of deceased by means of proper safeguards and appliances against said roving and uncontrolled currents of electricity.''

It is urged plaintiffs wholly failed to sustain the allegations of the petition and that the evidence conclusively shows Clonts came to his death through the sudden influx of 2000 or 2300 volts of electricity, occasioned by the crossing of the wires of defendant company with those of the Union Electric Light & Power Company at Taylor and Finney avenues, about five miles from the building in which Clonts was engaged. In support of this argument, it is said the petition charges defendant knowingly permitted certain roving electricity to pervade its premises at all times and, therefore, plaintiffs are not entitled to recover for an injury which resulted from a sudden influx of a very high voltage of electricity which occurred almost, or about, simultaneously with the death of Clonts and under such circumstances that defendant had no reason to anticipate it and no opportunity to either know of the impending danger or to protect against it. But though such be true, we believe the evidence amply supports the allegation of the petition and that it was competent for the jury to find therefrom that Clonts came to his death through the omission of defendant to safeguard the tiller rope and his person against the electricity which at all times pervaded defendant's premises. In this view, we accept defendant's argument, to the effect that the petition predicates the right of recovery on the failure of defendant to exercise the utmost care with respect to safeguarding the tiller rope, the elevator and the person of Clonts, against the electricity which pervaded the premises and was employed in the operation of the elevator.

The averments of the petition go to the effect that Clonts came to his death from roving and uncontrolled electricity which defendant knowingly and negligently permitted to pervade its premises, elevator and iron tiller rope. In respect of such roving and uncontrolled electricity, which defendant knowingly permitted to pervade the premises, elevator and iron tiller rope, it is averred that defendant breached its duty in failing to protect the iron tiller rope, elevator and person of Clonts by means of proper safeguards and appliances, etc. Doubtless the pleader contemplated only that defendant breached its duty with respect to guarding against such uncontrolled and roving electricity as pervaded its premises and the elevator with the knowledge of defendant; for such is the thought the language of the petition portrays. Accepting this view of the petition, the case is one for the jury if it appears substantial evidence was given which tended to sustain the averment, and this is true notwithstanding the fact that the contrary proof for defendant may appear to be quite conclusive. [Gannon v. Laclede Gas Light Co., 145 Mo. 502, 46 S. W. 968, 47 S. W. 907.]

The record abounds with evidence to the effect that this elevator and its insulation had been defective for as much as a year before the day on which Clonts came to his death. That it had leaked electricity during that time, the case almost concedes; for the proof to that effect is not controverted. Indeed, defendant's electrical engineer testified for plaintiffs that the leakage of electricity from the 500 volt circuit and motor into the tiller rope had been so great during that time as to occasion him to connect a lamp with the tiller rope on the inside of the elevator, to the end of warning those who grasped the tiller rope that it was charged with an electric current. It is said this lamp would go out, or refuse to glow, when the surplus current communicated to it from the tiller rope ex-

ceeded 200 volts and it would not glow at all unless
eighty volts were communicated thereto. From this,
it would seem the lamp only suggested that there was
either less than eighty volts of electricity or more than
200 playing on the tiller rope and therefore operated
as well to mislead as to warn. The proof for plaintiffs
is that defendant's superior officer, Pitkin, had been
notified several times during the months which pre-
ceded the death of Clonts that the tiller rope was
charged with electricity. On this question, the witness
says, "On each occasion I made these tests I found the
tiller rope was charged with electricity and reported
it to Pitkin . . . there was lots of trouble occurred
in that elevator at previous times. . . . I would go
to Pitkin and report them." No one can doubt that
this constitutes substantial evidence suggesting notice
to defendant of the fact that electricity was leaking
from some source into the tiller rope which plaintiff
and others were required to use. It is true the record
is devoid of proof that any one was seriously injured
from such electricity theretofore, but plaintiffs sought
to show, and the evidence was excluded on defendant's
objection, that several employees received shocks of
electricity at different times on grasping the tiller rope
in this elevator.

That defendant had notice of the defective or in-
sufficient insulation to control the electric current in
its proper channels and withhold it from the tiller
rope is not to be questioned on the record before us.
Indeed, we do not understand that this phase of the
case is seriously controverted. But it is argued the
proof conclusively shows that the elevator was insu-
lated as are other elevators of like kind and make,
which employ only 500 volts of electricity. There is
an abundance of proof for defendant to this effect, it
is true, but there is an abundance as well on the part
of plaintiffs tending to prove that defendant was dere-

160 App.—30

lict in respect of its duty to provide safeguards, consisting of simple devices usually and customarily used, which would have afforded complete protection to Clonts. It was shown in the proof, and it is conceded throughout the case, that the elevator here involved was not provided with either a copper ground wire for the purpose of diverting surplus electricity to the earth or a fibre block in the tiller rope, to the end of preventing surplus electricity from inhabiting or traveling over the same. Carrico, defendant's electrical engineer, introduced as a witness by plaintiff, testified that there were two appliances which might have been attached to this elevator which would have prevented the electricity from entering the tiller rope, one of which was a copper ground wire, and the other a vulcanized fibre block in the tiller rope. The testimony of this witness touching this question, which we copy verbatim from the record, in the form of questions and answers, is as follows: "Q. State whether there are appliances, and were appliances at that time, that could have been attached to that elevator which would have prevented the electricity from entering the tiller rope? A. At the time that this man was killed there was no appliances on that elevator to prevent electricity from entering the cable." After this answer, the court remarked that the answer was not responsive to the question of counsel, whereupon the witness said: "He asked if there were any appliances on the elevator at the time— Q. No, if there are any appliances, anywhere, known to you as an electrician, that could have been there? A. Yes, sir. Q. Will you please state to the jury what those appliances are and how they could have been attached to the elevator?" Then follows a colloquy between the court and counsel, whereupon the court ruled the question was a proper one and the witness inquired: "Do you want me to state that to the jury? Q. Yes; you understand the question, do you? A. Yes, sir, to state these appliances

that could have been put on this elevator to prevent this man from meeting his death. Well, these appliances, gentlemen of the jury, was a copper wire, which we shall call a ground wire. It forms a metallic circuit to the ground; and in case there is any current at any time enters this tiller cable it is conduited to the ground, for this reason; because it is nothing more or less than a short circuit. This current when it enters the cable, in order to get to a man's body, one side of the line had to be originally grounded, whenever there was any current that would get into this cable. And when it got into the cable you have to complete the circuit, and when you complete the circuit if there is no appliance on there to prevent it from going through your body, it will go through your body. And by attaching this copper wire the circuit blows the fuse and prevents it flowing through your body. And another appliance would be two fibre blocks; and by cutting the two cables, which are simply a loop—by cutting those two cables and drilling a hole through these fibre blocks and sticking the cable through the hole and by means of a cable clamp preventing it from slipping out. Then at any time the machine becomes charged with electricity it will be prevented from going through this fibre block. Now, those two appliances can be adapted to that purpose." The witness then enters into detailed explanations in response to questions by the court as to how the copper ground wire and vulcanized fibre block would prevent the tiller rope from becoming charged with electricity, at the conclusion of which counsel propounds the following questions, to which the following answers appear: "Q. I understand you to say that if a ground wire had been attached that that would have prevented this accident? A. Yes, sir. Q. Attached to what? A. Attached to the tiller cable, or tiller rope." Furthermore, O'Boyle, deputy elevator inspector for the city, testified for plaintiffs concerning additional safeguards which

might have been employed on the elevator as follows: "A. The tiller rope can be supplied with a break in the rope and that break filled in by non-conducting material, the same material that insulates the machine from the base, vulcanized fibre, can be used for it. The rope can be properly insulated from the machine, from getting a leak to the operator through the rope between the operator and the machine and inserting a piece of vulcanized fibre in there, that would not allow the current to travel further than that. A number of elevators have that. Q. That was not on this rope? A. No, sir. The appliance is one I see most of in inspecting. I come across that oftener than anything else; vulcanized fibre. In the tiller rope and in the chain—whatever works the controller, and between the current and the operator. It is applied in many places."

So we see the testimony of one witness, Carrico, defendant's electrical engineer, is that either a ground wire or the vulcanized fibre would have prevented the tiller rope from being charged with electricity, while the evidence of O'Boyle, the elevator inspector, is that a vulcanized fibre break inserted in the tiller rope would have prevented that rope from becoming charged with electricity. But it is argued for defendant that this testimony avails nothing for the reason that it is shown by the testimony of these same witnesses that such additional safeguards are only installed for the purpose of protecting the tiller rope and the operator of the elevator from the electricity which is employed in propelling it and not that from an outside source. It is true the witness, O'Boyle, does say that the appliance which he described, the vulcanized fibre, is installed for the purpose only of protecting against the electricity which is employed in operating the particular elevator, but we do not so understand the evidence of Carrico. But conceding the proposition advanced by defendant to be true, that such copper

ground. wire or vulcanized fibre would serve no other purpose than to protect against the electricity. employed in operating this elevator, it appears that such appliances, if installed, would have protected against 500 volts of electricity, for all of the proof is that such was the amount employed by defendant. Indeed, the case concedes that the elevator in its construction and make-up contemplated the use of 500 volts in its operation and that such an amount was used. The cable which furnished the electricity to operate the elevator communicated 500 volts of electricity to the motor, and that much was employed. The proof is all one way as to this matter. This being true, no one can doubt that if the evidence affords a reasonable inference that the deceased came to his death from receiving into his body a charge of 500 volts of electricity, which pervaded the premises and elevator and was employed in connection with propelling it, the question of his death from that source was both within the allegations of the petition and for the jury to determine. It may be that Clonts came to his death from being charged with the 500 volts of electricity employed in the elevator and if such be the fact, then the matter of an additional voltage of 2000 or more coming from the outside near or about that time is immaterial. There is evidence in the record that 500 volts of electricity would produce death under certain circumstances. For plaintiffs, Mr. Thomas Bailey Carter, supervisor of the city lighting department, testified as follows: "Q. Under certain circumstances would 500 voltage power kill a man? A. Yes, sir. Q. Under what circumstances? A. Well. if he has a good connection and has enough amperage behind it it will kill him. A trolley wire will kill you. Q. What is the average voltage of a trolley wire? A. 500 or 550 is what they generally carry." From this it appears, even if no electricity, other than that which was employed by defendant in operating the machinery of

this elevator, was available, that it was sufficient to occasion the death of Clonts, if communicated to his body by means of the tiller rope, under favorable conditions. That the tiller rope had been almost constantly charged with some electricity for many months theretofore from a leakage in the appliances, because of insufficient insulation, is abundantly shown. The witness, Kerr, a lineman in defendant's employ and introduced as a witness by it, testified that, upon his examining the tiller rope an hour or two after the death of Clonts, he found it charged with probably 400 volts of electricity. Clonts came to his death about 11:15 a. m., and it is true the elevator had been inspected and found in good condition by Carrico about 7:30 that morning; but it appears from the testimony of defendant's "trouble man," Kerr, that he received notice about 10:30 that forenoon that there was trouble on the 500 volt circuit which supplied the elevator. Speaking of the circuit which supplied the power for this particular elevator, this witness said: "I was the trouble man of the Laclede Gas Light Company. My duties was to try and find all the troubles I could find, and what was the occasion for any trouble that occurred. On that morning in question, we did have trouble with the 500 volt circuit. I cannot remember the time. I didn't go to work until 9:00 o'clock. It must have been at least 10:00 or 10:30 that we began to have a whole lot of trouble with the 500 volt circuit, and I started out to locate the trouble. I cannot say it was not 10:00 o'clock; it could not have been earlier than 10:00 o'clock. It must have been 10:30 before I started, because I didn't go to work until 9:00, and I was not in any hurry getting away from the office." From this it was certainly competent for the jury to find that, though the elevator had been inspected and found safe enough at 7:30 that morning, defendant's inspectors and officers knew that there was trouble with respect to the conduit which furnished the

electric power for its operation at 10:30, or forty-five minutes before the fatal charge was received from the tiller rope by Clonts, and that, notwithstanding this, no precautionary measures whatever were introduced to prevent a tragedy.

No one can doubt that it was defendant's duty to exercise the utmost diligence as to the matter, for such is the care the law requires in such circumstances. The proof is that 500 volts of electricity were sufficient to produce death under favorable conditions; and that the conditions here were favorable all of the evidence tends to prove, for it appears the floor of the elevator, on which Clonts was required to stand, was of sheet iron. Besides the floor of the elevator being constructed of sheet iron, which tended to invite electricity from the tiller rope, through the body of the operator, it appears, too, that the sheave wheel thereunder was affixed by an iron rod to the concrete side of defendant's retort house, which was always hot and dry. The evidence is, that had this sheave wheel been in moist earth instead, the conditions would have been much more favorable to the life of the operator, and that where it is planted in a dry place the hazard from the electrical current is greatly increased. There can be no doubt that there is substantial evidence tending to prove that deceased came to his death through receiving into his body the 500 volts of electricity which pervaded the tiller rope and found its source in that which was provided for the operation of the elevator, and that it was known to defendant that such electricity did pervade the tiller rope for a sufficient time theretofore to have protected against it, by the employment of either a copper ground wire or the insertion of a vulcanized fibre block. The evidence above pointed out tends to support both the theory and the averments of the petition and it was proper to refer it to the jury.

For defendant, the evidence goes to show that Clonts came to his death from a sudden influx of about 1400 volts of electricity occasioned by the crossing of defendant's wires with those of the Union Electric Light & Power Company near Taylor and Finney avenues, about five miles distant. At that point, the wires of the Union Electric Light & Power Company carried about 2300 voltage of electricity and ran east and west across Taylor avenue, while the wire of this defendant which communicated with its elevator carried 500 voltage and ran north and south along Taylor avenue, crossing about eighteen inches above the high voltage wire of the Union Electric Light & Power Company. It is to be inferred, though the proof is not positive and direct, that employees of the Union Electric Light & Power Company were engaged at work on their line and by tightening a cable caused one of its poles to be so moved as to bring its wire carrying 2300 voltage up to and against the 500 voltage wire of defendant. The result of this contact of the two wires caused the insulation to burn from both, so that each wire was charged with about one-half of the volume of electricity conveyed through both. As we understand the testimony of the expert on this question, the collision of two wires, one bearing 2300 volts and one 500 volts, operated to charge each with about 1400 volts of electricity, or divided the sum total between the two. Both companies maintained automatic indicators in their offices to suggest possible troubles on their wires. The automatic indicator in the office of the Union Electric Light & Power Company and its records showed that notice was received at such office on that date at 11:13 a. m., the indicator suggesting that the ground trouble on the wires was in the locality of Finney and Taylor avenues. It seems when crossings of wires occur, as is said here, the automatic indicator will emit a spark or flash of light suggesting the fact. The indicator in the office of Station A of

defendant company, where Clonts was killed, suggested trouble on its 500 volt wire and those in charge recorded the fact at 11:15 a. m. The proof touching the time when Clonts received the electrical shock resulting in his death was given by W. J. O'Brien, who testified that he was working for defendant at Station A and remembered the accident. He said, "I made a report of the death of Clonts. It occurred about 11:15 a. m." Indeed, the case concedes throughout that deceased came to his death about 11:15 a. m., but the mere fact that plaintiffs did not put on evidence to contradict that of defendant pertaining to the crossing of the wires and that a sudden influx of a high voltage of electricity came into its elevator at that precise time, by no means operates as a matter of law to concede that such evidence is true. It is true plaintiffs introduced no evidence tending to contradict that of defendant pertaining to the crossing of the wires nor that one-half of the voltage of electricity being conveyed on the wires of the Union Electric Light & Power Company and defendant's wire as well was suddenly thrust upon the elevator in Station A, where deceased was at work. But though such be true, the court may not declare as a matter of law that plaintiffs' prima facie case is completely overthrown by the uncontradicted testimony of defendant, for such would invade the province of the jury. As we understand the rule of decision, the evidence given (other than documents which the court must construe) for the party on whom rests the burden of proof is always to be weighed by the jury, for it is its province alone to determine the credibility of the witnesses and the weight and value which should be accorded to their testimony. Such is the view of the Supreme Court announced in Gannon v. Laclede Gas Light Co., 145 Mo. 502, 46 S. W. 968, 47 S. W. 907, which is directly in point, and we believe the doctrine to be sound in principle.

The question as to whether Clonts came to his death as a direct result of defendant's failure to furnish reasonable safeguards against roving electricity which it permitted to pervade the elevator and tiller rope and of which it had due notice, or by the exercise of due care might have known, was submitted to the jury for plaintiffs, while that as to whether or not Clonts came to his death from a sudden influx of electricity occasioned by the crossing of the wires in accordance with defendant's evidence was submitted by an instruction for it. By their verdict the jury affirmed that plaintiffs' father came to his death from roving electricity which pervaded the elevator and tiller rope through the dereliction of defendant to provide reasonable safe guards, to the end of affording him proper protection. As before pointed out, there is an abundance of evidence in the record to support this view of the case, which is the theory relied upon in the petition.

Though plaintiffs' first instruction is criticized, we believe it to be sound in doctrine. It is true that it is somewhat abstract, but it certainly operated no harm to defendant, and it is unnecessary to further discuss it.

Plaintiffs' second instruction is criticized for the reason that it employs the word "roving" in connection with the term electricity, and it is said this is error in view of the fact that the word "roving" in that connection is not defined in other instructions, but, as we understand it, the word "roving" is used in its ordinary, conventional sense, and it was certainly as well understood by the jury as any other plain, ordinary English word so used. The meaning of words in common use and which have no special technical meaning in the connection in which they are used in an instruction need not be explained to the jury. [Holland v. McCarty, 24 Mo. App. 112; Warder v. Henry, 117 Mo. 530, 23 S. W. 776.] It is said, too, this instruction is

erroneous for the reason that it permitted the jury to find for plaintiff under the hypothesis therein contained, if a powerful current of electricity, which occasioned Clonts' death, entered his body from the tiller rope by reason of "the negligence of defendant as defined in this and other instructions." The suggestion is that the instruction is erroneous for the reason no definition of negligence is contained in any of the instructions. We believe this argument to be unsound for the reason a departure from the standard defintion of negligence has been made in this state as to the care required in handling, transmitting and controlling the highly dangerous force of electricity. As to such agency, the rule of decision is that the law imposes upon one employing it the duty of exercising the utmost care and prudence to prevent injury to others who are rightfully about it. Especially is this true with respect to the matter of insulation. [See Booker v. Southwest Missouri R. Co., 144 Mo. App. 273, 287, 128 S. W. 1012; Geismann v. Missouri-Edison Elec. Co., 173 Mo. 654, 73 S. W. 654; Von Trebra v. Laclede Gas Light Co., 209 Mo. 648, 108 S. W. 559; Ryan v. St. Louis Transit Co., 190 Mo. 621, 89 S. W. 865; Winkelman v. Kansas City Elec. Light Co., 110 Mo. App. 184, 85 S. W. 99.] The instruction under consideration proceeds on this theory and incorporates this view as the standard by which defendant's liability must be determined and we regard it sufficient on that score.

Over the objection and exception of defendant, plaintiffs were permitted to ask certain questions as to whether or not defendant added new safeguards to the elevator the day following the occurrence here involved. Ordinarily, such course of examination would be an erroneous one, for if defendant, out of abundant caution, saw fit to make some alterations in its premises conducive to greater safety after the injury, this should not be taken into consideration in determining

the question of negligence theretofore. It is said the taking of such precautions against the future is not to be construed as an admission of responsibility for the past. [Bailey v. Kansas City, 189 Mo. 503, 511, 87 S. W. 1182; Bokamp v. C. & A. R. Co., 123 Mo. App. 270, 287, 100 S. W. 689; Ely v. St. Louis, etc., R. Co., 77 Mo. 34, 37.] But upon an examination of the record touching this matter, it appears defendant is estopped to complain, for the reason it invited investigation on that score. In examining its witness, Gallagher, superintendent of its electrical department, defendant's counsel propounded the following question and elicited the following answer thereto: "Q. Has any change been made in the Laclede Gas Light Company's 500 volt line since that day? A. No, sir." This question and answer pertain directly to the 500 volt line which communicated with the elevator here involved. On cross-examination, plaintiffs' counsel inquired of the same witness, "You say there have been no changes made in that elevator since the accident occurred? A. Not to my knowledge." Defendant's counsel interposed an objection, however, to this question as follows: "I object to that as immaterial. We have no objection to it, except that." It appears, then, that the counsel disclaimed any other objection thereto than that it was immaterial. It may be said that if it was material for defendant's counsel to inquire as to a change in the 500 volt wire communicating with this elevator, then it was material, too, for plaintiffs' counsel to inquire as to a change with respect to the elevator, for the course of examination reveals that the two may not be disassociated. During the examination in chief of the witness, Evans, superintendent of defendant gas company, defendant's counsel propounded the following questions and elicited the following answers: "Q. What if any changes had been made on that elevator between the

time of the accident and the time you started it, between two and three o'clock? A. I think that a new armature was put in the motor. Q. In the motor? A. In the motor. Q. What had happened to the old armature, if you know? A. I think that there was the insulation of some of the wires in the winding of the armature had been burnt, and short circuited, of course. Q. How did it work the following day? A. It worked that day, and worked that night; it worked all right. Q. So that it was interrupted at the time of the accident until about two or three o'clock? A. That is as I remember, yes.'' The examination to this extent touching repairs on the elevator after the accident and its condition the following day certainly authorized plaintiffs' counsel to cross-examine touching the same subject-matter. Upon such cross-examination, the witness stated that they furnished the employees engaged about the elevator thereafter with rubber gloves to use while grasping the tiller rope and placed planks on the sheet iron floor of the elevator for them to stand upon and, furthermore, connected a copper ground wire with the tiller rope, to the end of carrying surplus electricity into the earth. In view of the fact that defendant's counsel inquired as to subsequent repairs, we believe it was entirely competent for plaintiffs' counsel to cross-examine the witness thereon.

There appears to be no reversible error in the record and the judgment should be affirmed. It is so ordered. *Reynolds, P. J.,* and *Caulfield, J.,* concur.