SUE R. PLEDGE, Respondent, v. LEMMIE C. GRIF-FITH, Appellant.

St. Louis Court of Appeals. Opinion Filed April 2, 1918.

1. **CONVERSION: Evidence: Ownership of Bank Stock: Case for the Jury.** Where plaintiff's testimony shows that her money went into the purchase of five shares of bank stock, and that defendant admitted that plaintiff owned five of the shares of stock which came into his possession, obtained her permission to sell them, and after doing so admitted that he held the money in his possession as belonging to her, *held* a case for the jury, though the testimony of plaintiff does not trace her money directly into the five shares of stock, which, she asserted, belonged to her and which were sold by defendant.

2. ——: ——: **Admissions of Infant.** Such admissions of defendant were admissible against him, though he had *not* attained his majority when the admissions were made.

3. ——: **Infants: Liability for Conversion.** If a minor retained and converted to his own use the proceeds of a sale of stock belonging to plaintiff, his plea of minority would not shield him from liability to plaintiff therefor.

4. ——: **Ownership of Bank Stock: Evidence: Admissibility.** In a suit to recover part of the proceeds of bank stock sold, plaintiff claiming that she owned five shares of such stock, the court improperly refused to permit the defendant's mother to testify that plaintiff did not claim to have furnished any of the·money which went into the stock purchased.

5. ——: **Instructions: Damages: Measure·of Damages.** In such action, where the petition averred and the proof showed that the stock claimed by plaintiff was sold for $600, and there was no evidence that defendant had received any dividends thereon, an instruction that if the jury found for plaintiff to assess the amount of her recovery at such a sum of money as they might find defendant received for the five shares of stock, not to exceed $750, with interest thereon, was erroneous.

6. **TRIAL PRACTICE:**   Improper Remarks of Counsel:   Failure of Court to Reprimand: Error.   Where plaintiff's counsel in addressing the jury stated:   "Yes, he (defendant) takes the very money he collected with the consent of this now aged woman—young and vigorous that he is, the only heir as the testimony goes in this case, of Mrs. Griffith, to I forget how many acres they said was in that farm, the only heir, and he takes this money and buys another farm and uses it, and then looks you in the face and pleads the 'baby act' and don't deny it—", *held* that such argument was improper, and, after objection thereto, the court should have promptly taken steps to reprimand counsel, and required that the remarks be withdrawn, and to instruct the jury to disregard same to alleviate the baneful effect of such argument.

Appeal from the Circuit Court of Pike County.— *Hon. Edgar B. Woolfolk*, Judge.

REVERSED AND REMANDED.

*J. E. Thompson, R. L. Motley* and *Hostetter & Haley* for Appellant.

*Pearson & Pearson* for respondent.

ALLEN, J.—Plaintiff's petition alleges that plaintiff "formerly owned some shares of stock in the Farmers State Bank, of Bristow, Oklahoma; that they were held for her in the name of her brother, J. A. Pledge, now deceased; that in the fall of 1910 she authorized Lemmie C. Griffith (defendant) to sell the same for her; that he did sell the same and received therefor the sum of $600, and the accumulated dividends on said shares of stock, the exact amount of which the plaintiff says she does not know, but which she alleges to be $150; that defendant has refused to turn over to her the proceeds of the sale of said stock and accumulated dividends, although often requested to do so; that he has paid to her the sum of $36 for which he is entitled to a credit." Judgment is prayed for $750 with interest "from date of demand, to-wit, the ——day of——, 1910, less credit of $36."

The answer first contains a general denial and then sets up that for many years prior to the time

when defendant attained his majority, J. A. Pledge was the curator of defendant's estate and had possession of funds belonging to defendant amounting approximately to $3500; that J. A. Pledge, as such curator, used funds of defendant in his hands in the purchase of twenty shares of stock of the bank mentioned in the petition, taking the certificates in his own name; that in the fall of 1910, while defendant was a minor, J. A. Pledge, being desirous of settling with defendant as curator, sold said twenty shares of stock and delivered the proceeds to defendant in part settlement with defendant as curator. It is further averred that all of the transactions above mentioned took place while defendant was a minor; and that defendant was a minor "at the time plaintiff alleges the contract between her and this defendant was made, and that the proceeds of the sale of this bank stock were used by this defendant, and that this defendant is in no manner liable to plaintiff in any sum."

The trial, before the court and a jury, resulted in a verdict and judgment in favor of plaintiff in the sum of $717, and the defendant appeals. After the case reached this court plaintiff died, and the cause has been revived in the name of her administrator, E. G. Pledge.

Plaintiff, Sue R. Pledge, was an aunt of the defendant, being a sister of defendant's mother, Mrs. Griffith. She is frequently referred to in the testimony as "Aunt Sue." J. A. Pledge, who died in 1913, was a brother of plaintiff and of defendant's mother. He is referred to as "Uncle Arch." He was the curator of an estate belonging to defendant, his nephew, then a minor and who did not attain his majority until April 24, 1911. It appears that prior to 1903 all of these persons lived together as members of one family at the Griffith home in Pike County, Missouri. It is said that in 1903 J. A. Pledge went to Oklahoma intending to remain there permanently, though he made frequent trips to Pike County; and

that in October, 1904, the other persons mentioned also moved to Oklahoma where they lived until August, 1905, when they returned to this State. It is said that Pledge did not again take up his residence in Missouri until some time in 1909, although he went "back and forth" in the meantime. After his return all of the said persons again resided together in Pike County, at the Griffith home, until after defendant became of age in 1911.

J. A. Pledge made some investments in Oklahoma. Whether or not he had funds of his own invested there is not clear. The evidence shows, however, that he had in his hands moneys belonging to plaintiff and her sister, Mrs. Griffith, as well as funds belonging to his said ward; and that he was supposed to have purchased stock of the First State Bank of Bristow, Oklahoma, for plaintiff and her sister, as well as for the defedant, his ward. In December, 1910,—J. A. Pledge being then, it is said, in failing health—defendant and Senator W. J. Buchanan, cashier of a bank at Eolia, Pike County, went to Oklahoma for the purpose of "looking after" J. A. Pledge's business, "in trying to get a line on it." Defendant and his companion found, at the Bristow bank in Oklahoma, in a certain box, certificates for twenty shares of stock of said bank, of the par value of $100, issued to J. A. Pledge. This stock and certain other papers of Pledge were brought back to Eolia. It was found also that Pledge had on deposit in the bank at Bristow between twelve hundred and thirteen hundred dollars. This money was withdrawn on a check executed by Pledge, and was turned over to the defendant. The certificates of stock mentioned were indorsed by Pledge and were sold by defendant through Senator Buchanan to E. L| Jones, cashier of the Bristow bank, in January, 1911, defendant receiving $2400 therefor. It is plaintiff's contention that five of the shares of stock thus sold belonged to her, and that she is entitled to recover the proceeds of the sale thereof.

Plaintiff testified that her brother, J. A. Pledge, invested for her $675 which she placed in his hands, and that he purchased with it five shares of bank stock in Oklahoma; that he "looked after her business," and that she "left everything to him." This she thought was in 1902 or 1903. She said that her brother, upon one occasion, gave her $60 which purported to be a dividend upon the stock. She testified that shortly before defendant sold the twenty shares of stock mentioned above, she had a conversation with her brother, J. A. Pledge, in regard to selling her portion thereof, and later a conversation with her nephew, this defendant, in regard to the matter. As to this latter conversation she testified: "He (defendant) told me he was going to Oklahoma to look after his Uncle Arch's affairs down there, and he said if he could, he wanted to sell the bank stock, and he said: 'Aunt Sue, you had better sell yours.' And I said: 'No Lemmie, I don't want to sell mine.' 'I am getting a dividend that is pretty good.' 'I don't think I will sell it now.' And so he didn't insist on saying anything more about it until after he came back." And she testified that after defendant returned from Oklahoma he had a further conversation with her and said: "Aunt Sue, I think you are making a mistake, you ought to sell your bank stock. 'It would make mother feel better if, you would sell them both together;' that he said that he was 'on a deal with Mr. Jones, cashier of the bank;' " and that she thereupon said: "Lemmie, if you think its best, of course sell it, . . . your Uncle Arch turned it over to you and you can sell it;" and that defendant said: "All right." She further testified that defendant afterwards told her that he realized $600 for the five shares.

Plaintiff's further testimony is that after defendant had reported to her that the stock had been sold, he told her that Senator Buchanan would lend her money at six per cent, to which she objected, saying: "I

think I can loan it;" that later defendant came to her and said that he would like to borrow the money, and that he would give her a good note and six per cent. interest, and that she agreed to do this; that thereafter she frequently requested defendant to give her the note, and he repeatedly promised to do so, but that she did not succeed in obtaining a note and did not receive any money from defendant with the exception of $5 with which to purchase some medicine and $26 to pay for some dental work.

On cross-examination plaintiff testified that she never saw the certificates of stock that her brother bought with her money; that her brother invested $675 for her sister, Mrs. Griffith, at the same time, but that she did not know whether her sister ever "got any of her money back." When asked if the bank stock bought for her and her sister was not sold by J. A. Pledge in 1907, she answered in the negative. When further asked if she did not know that her brother sold some bank stock in 1907, she said: "That was Lemmie's." She was asked if her money and that of her sister was not used in making the first purchase that her brother made of any bank stock in Oklahoma and she replied that that was her understanding—though she could not tell just when it occurred. She said that she knew nothing about any subsequent purchase of bank stock by her brother.

Senator Buchanan, called as a witness for plaintiff, testified concerning his trip to Oklahoma with defendant in December, 1910, the finding of the certificates for the twenty shares of stock mentioned above, the sale thereof to E. L. Jones, and the obtaining by defendant of the money on deposit in the Bristow bank to the credit of J. A. Pledge. He further testified that in a conversation with defendant in regard to selling the twenty shares of stock when E. L. Jones offered $120 per share therefor, the defendant told the witness "that he didn't know about Aunt Sue's five shares, whether she wanted to sell it, she might want

to keep it and use the dividends from it, but he wasn't prepared to answer that day;" but that later defendant told him to "go ahead and sell the stock." When asked if defendant told him how many shares of stock Aunt Sue had, he answered: "Five shares, he said." He stated that this occurred after his return from Oklahoma.

This, in substance, is the testimony in chief in behalf of plaintiff.

Defendant introduced the deposition of E. L. Jones, cashier of the First State Bank of Bristow, Oklahoma. By this witness it was shown that on or about March 13, 1905, certificates of stock of that bank were issued to J. A. Pledge, as follows, viz., certificates No. 36 for forty shares, certificate No. 37 for twenty shares, and certificate No. 38 for twenty shares—all of the par value of $25 each. The witness identified a check, which was attached to the deposition introduced in evidence at the trial, drawn upon the Bristow bank, signed by J. A. Pledge and payable to W. E. Jones for $2500, as being the check given by Pledge in payment for the said stock thus acquired by him. And the witness testified that on February 4, 1908, after Oklahoma had been admitted to statehood, the certificates, Nos. 36, 37 and 38, supra, were surrendered, and in lieu thereof there were issued to J. A. Pledge three certificates, Nos. 31, 32 and 33, for ten shares, five shares and five shares respectively, of the par value of $100 each. And it was shown by this witness that the last-mentioned certificates were, on December 22, 1910, assigned by J. A. Pledge to W. J. Buchanan, and on January 17, 1911, were assigned by W. J. Buchanan to E. L. Jones, who purchased them.

Defendant also introduced the deposition of M. Jones, president of the First State Bank of Bristow, Oklahoma. This witness, when asked how much stock of that bank J. A. Pledge had owned, answered: "He at one time owned one hundred and twenty shares and afterwards sold forty shares back to me." He further

stated that Pledge at one time was the owner of certificate "No. 23," which represented the forty shares which the witness afterwards purchased from him.

Defendant introduced in evidence certain settlements made by J. A. Pledge, as curator of defendant's estate. The last of these settlements, made August 11, 1910, showed a balance due defendant of $3456.47.

As a witness in his own behalf, defendant testified that the twenty shares of stock mentioned above were purchased with his money, while he and the other parties mentioned were living together in Oklahoma in 1905. He testified that his mother and father borrowed from his uncle some money belonging to defendant, securing the same by a certain farm; that later this money was loaned out by his mother for a time, through a bank at Clarksville, Missouri, and was repaid to her by a draft, shown the witness, for $2650, of date February 16, 1909; and that this draft was turned over to his curator who used $2500 of the proceeds in purchasing the bank stock afterwards exchanged for the twenty shares above mentioned. He testified also that he knew that there had been a previous purchase of stock of the Oklahoma bank by his uncle to the extent of $1000 par value, but did not know, of his own knowledge, "whose money had gone into that."

In regard to his conversation with Senator Buchanan defendant testified, in substance, that prior to going to Oklahoma he told Senator Buchanan it was his understanding that there were thirty shares of bank stock in Oklahoma, twenty of which belonged to him, and the other ten to plaintiff and defendant's mother. He declared that after his return from Oklahoma—having discovered but twenty shares—he did not tell Senator Buchanan that it would be necessary to consult plaintiff about the selling of such stock, but that he said that he wanted to consult his mother. His testimony is that he did not consult plaintiff in regard to selling the twenty shares of stock; that his

uncle had told him in the presence of his mother and plaintiff that the twenty shares belonged to him; that plaintiff did not claim to own any of the stock until some weeks after it had been sold; and that when plaintiff asked him, at different times, to give her a note he always declined to do so upon the ground that he did not owe her anything. He admitted that after the sale of the stock he gave plaintiff $5 upon one occasion and $22 or $24 upon another, for the purposes mentioned by her in her testimony, but he said that these were mere gifts. He further stated, on cross-examination, that long after the stock was sold, his uncle, J. A. Pledge, came to him and endeavored to get him to sign a note for "Aunt Sue;" but that he told his uncle that he didn't owe plaintiff any money. His testimony, as well as that of other testimony in the case, shows that the proceeds of the sale of the twenty shares of stock were invested by him in a farm.

Defendant also testified that he received about $1250 which was on deposit in the Bristow bank to the credit of J. A. Pledge, though it appears that in giving his deposition prior to trial defendant stated that he and his mother received the money; and that he received "other property" found in Pledge's name in Oklahoma.

Mrs. Griffith, defendant's mother, was called as a witness for defendant. She testified that her brother, J. A. Pledge, bought "a thousand dollars worth" of the stock of the Bristow bank for her and her sister, this plaintiff; and that her brother never accounted to her for any part of her money. This witness stated that the stock purchased with her money and that of plaintiff was acquired in 1904, and that her brother sold it in 1907; but that the witness never received any portion of the proceeds.

Touching the purchase of the eighty shares of stock in 1905, which were afterwards exchanged for the twenty shares of stock sold in 1911, this witness said that she and her husband borrowed from J. A.

Pledge $2500 which the latter had in his hands as defendant's curator, giving therefor a note secured by a mortgage upon a farm; that the farm was afterwards sold and the witness made a loan of the money through a bank in Clarksville, Missouri. She further testified, without objection, that in February, 1905, when the note which she held for this money became due, her brother, J. A. Pledge, said: "I think I can do better down here with it, I think I can get bank stock, and if you do I think I can get more interest on it;" and that thereupon the witness procured from the Clarksville bank a draft for the money, which she delivered to Pledge. This draft, for $2650, dated February 16, 1905, payable to the order of Mrs. Mary G. Griffith, and bearing the indorsements of Mrs. Griffith, J. A. Pledge, and the Bristow bank, was put in evidence.

This witness further testified that she heard a conversation between plaintiff and the defendant in which plaintiff demanded of defendant a note for her money; that defendant denied that he had any money belonging to plaintiff, and refused to give her a note; that plaintiff then said: "Well, you agreed to," and that to this defendant replied: "I can't help it, its mine, Uncle Arch told me it was mine, and I can't help it."

I

It is argued that the court erred in refusing to peremptorily direct a verdict for defendant. Because of this insistence we have set out the evidence, supra, in much detail; and we think that it cannot be doubted that the evidence adduced made the case one for the jury. While the testimony of plaintiff does not trace her money directly into the five shares of stock, which, she asserted, belonged to her, and which was sold by defendant, her testimony shows that $675 of her money went into the purchase of five shares of stock of the Bristow bank; and that defendant admitted that she owned five

of the shares which came into his possession, obtained her permission to sell them, and after doing so admitted that he held the money in his possession as belonging to her. Though defendant had not attained his majority his said admissions, as testified to by plaintiff, were admissible against him. [See 1 R. C. L. 488; 14 R. C. L. 282; Atchison, etc., Ry. Co., v. Potter, 60 Kan. 808; Chicago City Ry. Co., v. Tuohy, 196 Ills. 410.]

The testimony for plaintiff was sufficient to make out a *prima-facie* case against the defendant; and the *prima-facie* case, so made, was not entirely overthrown and destroyed by the evidence adduced in behalf of defendant, which depended for its vitality and force upon the oral testimony of defendant's witnesses. [See Gannon v. Gas Light Co., 145 Mo. 502, 46 S. W. 968, 47 S. W. 907.]

In any view of the case, the contention that the evidence touching the matter conclusively established the fact that plaintiff's money did not go into the purchase of any of the twenty shares of stock sold by defendant in 1911, but went into an earlier purchase of stock which was sold in 1907, cannot, we think, be sustained. It is true that the evidence in defendant's behalf tends to show that in February, 1905, $2650, which belonged to defendant's estate then in the hands of his curator, was paid to Mrs. Griffith by the draft mentioned above; that this draft was turned over to J. A. Pledge, defendant's curator, and by him deposited in his account in the Bristow bank; and that within a short time thereafter Pledge issued a check for $2500 on this same bank by which he purchased eighty shares of the stock of the bank, of the par value of $25 each, which stock was afterwards exchanged for the twenty shares sold by defendant in 1911. But, aside from the draft and the check mentioned, this evidence consisted of the oral testimony of the defendant and his witnesses, not admitted to be true; and it was for the jury to believe

or disbelieve such testimony. Assuming that the $2650 so deposited by Pledge was defendant's money, it cannot be said to have been conclusively shown that the $2500 which Pledge afterwards checked out in payment for the stock mentioned consisted of funds belonging to defendant. And the manner in which the stock was divided and held by Pledge, in the three certificates, was in keeping with plaintiff's theory that one-half of it was acquired with money belonging equally to her and her sister.

Likewise the contention that plaintiff's money was invested, together with that of her sister, in 1904, in the purchase of forty shares of the stock of this bank (of the par value of $25 each), which was sold by Pledge in 1907, has nothing definite to support it except the testimony of defendant's mother. From the deposition of M. Jones it appears that in addition to the stock which afterwards became the twenty shares sold by defendant, J. A. Pledge at one time owned forty shares of stock of this bank, (of the par value of $25) represented by certificate No. 23, which the witness purchased from him. But though there is this reference to certificate No. 23, it was not shown when Pledge acquired the stock represented by it, nor when Jones purchased it from him.

It is also true that plaintiff testified that it was her understanding that her money was invested in the first purchase of stock of the bank made by Pledge; but her testimony as a whole touching that matter was not such as to constitute a conclusive admission that her money went into the purchase of stock other than that found in her brother's name in December, 1910, and which defendant sold in January, 1911.

And if in fact defendant retained and converted to his own use the proceeds of the sale of stock belonging to plaintiff, under the circumstances shown in evidence, his plea of minority would not shield him from liability to plaintiff therefor. [See 22 Cyc., p. 618, et seq.]

We think that the trial court did not err in re-
fusing to take the case from the jury.

## II.

There are numerous assignments of error predica-
ted upon rulings of the court, adverse to appellant,
with regard to the admission of testimony.   It is un-
necessary to consider all of them.   We think that it
cannot be doubted that certain rulings complained
of, and to which exceptions were duly saved, were
erroneous, and prejudicial to defendant. It appears that
the court unduly restricted defendant's counsel in
his cross-examination of plaintiff, but this need not
be dwelt upon.   And the court, we think, likewise con-
fined the evidence regarding the affairs of J. A. Pledge,
and his dealings with defendant's property, within too
narrow bounds.   Though it be true that under the
pleadings, and theory upon which the case was tried,
the crucial question of fact for determination was
whether or not plaintiff's money went into the purchase
of the five shares of stock in controversy, never-
theless, under the circumstances, the evidence could
with propriety take a rather wide range, particularly
in view of the fact that it was shown that J. A. Pledge
handled funds and made investments for defendant,
plaintiff and plaintiff's sister, as though he were
dealing with his own property.

Again the court—improperly we think—refused
to permit defendant's mother to testify that plaintiff
did not claim to have furnished any of the money
which went into the stock purchased in 1905.   Testi-
mony of this character, by a witness who had been
intimately associated with plaintiff, was not incompe-
tent or wholly irrelevant.

In many instances general objections of plaintiff's
counsel were sustained and there is nothing to in-
dicate the theory upon which the court proceeded in
making its rulings.   It would unduly extend the opin-
ion to discuss these questions in detail.   It is sufficient

to say that in the particulars noted above, at least, the court's rulings cannot be sustained.

## III.

Plaintiff's second instruction, of which complaint is made, told the jury that if they found for plaintiff to assess "the amount of her recovery at such a sum of money" as they might find from the evidence defendant received for the five shares of stock, not to exceed the sum of $750, together with interest thereon, etc. This was error, since the petition avers and the proof shows that the stock claimed by plaintiff was sold for $600; and there was no evidence that defendant had received any dividends thereon. Whether or not this would constitute reversible error, in view of the amount of the verdict, we need not say. Neither need we consider the assignment of error that the verdict is, in any event, excessive.

## IV.

Another assignment of error relates to the remarks of counsel for plaintiff in addressing the jury. Much of the argument of plaintiff's counsel is set out in the record, but we need only refer to the following portion thereof, viz: "Yes, he (defendant) takes the very money that he collected with the consent of this now aged woman—young and vigorous that he is, the only heir as the testimony goes in this case, of Mrs. Griffith, to, I forget how many acres they said was in that farm, the only heir, and he takes this money and buys another farm and uses it, and then looks you in the face and pleads the 'baby act' and don't deny it.—"

That the fervor of plaintiff's learned counsel, in his zeal for his client's cause, carried him beyond the limit of proper argument, to the prejudice of defendant, cannot, we think, be doubted. An objection thereto was sustained, but defendant excepted to the failure

of the court to reprimand counsel and require that the remarks be withdrawn, and to instruct the jury to disregard the same. We regard it as clear that the court should have promptly taken steps of this character in order to alleviate, so far as possible, the baneful effect of this argument.

The judgment must accordingly be reversed and the cause remanded. It is so ordered. *Reynolds, P. J.,* and *Becker, J.,* concur.